# PATTON ET AL. *v.* YOUNT

No. 83–95. Argued February 28, 1984—Decided June 26, 1984

*F. Cortez Bell III* argued the cause for petitioners. With him on the brief was *Thomas F. Morgan.*

*George E. Schumacher,* by appointment of the Court, 464 U. S. 980, argued the cause for respondent. With him on the brief were *Thomas S. White* and *James V. Wade.*

JUSTICE POWELL delivered the opinion of the Court.

This case brings before us a claim that pretrial publicity so infected a state criminal trial as to deny the defendant his Sixth Amendment right to an "impartial jury."

## I

On April 28, 1966, the body of Pamela Rimer, an 18-year-old high school student, was found in a wooded area near her home in Luthersburg, Clearfield County, Pa. There were

numerous wounds about her head and cuts on her throat and neck. An autopsy revealed that she died of strangulation when blood from her wounds was drawn into her lungs. The autopsy showed no indication that she had been sexually assaulted.

At about 5:45 the following morning, respondent Yount appeared at the State Police Substation in nearby DuBois. Yount, who had been the victim's high school mathematics teacher, proceeded to give the police oral and written confessions to the murder. The police refused to release the confession to the press, and it was not published until after it was read at Yount's arraignment three days later. Record, Ex. P–1–a, P–1–d. At his trial in 1966, the confessions were admitted into evidence. Yount took the stand and claimed temporary insanity. The jury convicted him of first-degree murder and rape, and he was sentenced to life imprisonment. On direct appeal the Pennsylvania Supreme Court determined that under *Miranda* v. *Arizona,* 384 U. S. 436 (1966), police had given Yount inadequate notice of his right to an attorney prior to his confession. The court remanded for a new trial. *Commonwealth* v. *Yount,* 435 Pa. 276, 256 A. 2d 464 (1969), cert. denied, 397 U. S. 925 (1970).

Prior to the second trial in 1970, the trial court ordered suppression of Yount's written confessions and that portion of the oral confession that was obtained after he was legally in custody. The prosecution dismissed the rape charge. There followed an extensive *voir dire* that is now at the heart of this case. Jury selection began on November 4, 1970, and took 10 days, 7 jury panels, 292 veniremen, and 1,186 pages of testimony. Yount moved for a change of venue before, and several times during, the *voir dire.* He argued that the widespread dissemination of prejudicial information could not be eradicated from the minds of potential jurors, and cited in support the difficulty of the *voir dire* and numerous newspaper and other articles about the case. The motions were denied. The trial court noted that the articles merely reported

events without editorial comment; that the length of the *voir dire* resulted in part from the court's leniency in allowing examinations and challenges of the jurors; that "almost all, if not all," the jurors seated had "no prior or present fixed opinion"; and that there had been "little, if any, talk in public" between the two trials. The court also observed that the *voir dire* of the second trial had been sparsely attended.

Ultimately, 12 jurors and 2 alternates were seated. At the second trial, Yount did not take the stand and did not claim temporary insanity. Instead he relied upon cross-examination and character witnesses in an attempt to undermine the State's proof of his intent. The jury convicted him again of first-degree murder, and he was resentenced to life imprisonment. The trial court denied a motion for a new trial, finding that practically no publicity had been given to the case between the two trials, and that little public interest was shown during the second trial. App. 268a. In addition, the court concluded that the jury was without bias. The Pennsylvania Supreme Court affirmed the conviction and the trial court's findings. *Commonwealth* v. *Yount*, 455 Pa. 303, 311–314, 314 A. 2d 242, 247–248 (1974).

In January 1981, Yount filed a petition for a writ of habeas corpus in United States District Court. He claimed, *inter alia*, that his conviction had been obtained in violation of his Sixth and Fourteenth Amendment right to a fair trial by an impartial jury. The case was assigned to a Magistrate, who conducted a hearing and recommended that the petition be granted. The District Court rejected the Magistrate's recommendation. 537 F. Supp. 873 (WD Pa. 1982). It held that the pretrial publicity was not vicious, excessive, nor officially sponsored, and that the jurors were able to set aside any preconceived notions of guilt. It noted that the percentage of jurors excused for cause was "not remarkable to anyone familiar with the difficulty in selecting a homicide jury in Pennsylvania." *Id.*, at 882. In addition, the court reviewed

the instances in which the state trial court had denied a challenge for cause, and upheld the trial court's view that the jury was impartial.

The Court of Appeals for the Third Circuit reversed. 710 F. 2d 956 (1983). The court relied primarily on the analysis set out in *Irvin* v. *Dowd*, 366 U. S. 717 (1961), and found that pretrial publicity had made a fair trial impossible in Clearfield County. It independently examined the nature of the publicity surrounding the second trial, the testimony at *voir dire* of the venire as a whole, and the *voir dire* testimony of the jurors eventually seated. The publicity revealed Yount's prior conviction for murder, his confession, and his prior plea of temporary insanity, information not admitted into evidence at trial.[1] The *voir dire* showed that all but 2 of 163 veniremen questioned about the case[2] had heard of it, and that, 126, or 77%, admitted they would carry an opinion into the jury box. This was a higher percentage than in *Irvin*, where 62% of the 430 veniremen were dismissed for cause because they had fixed opinions concerning the petitioner's guilt. Finally, the Court of Appeals found that 8 of the 14 jurors and alternates actually seated admitted that at

---

[1] The Court of Appeals rejected as without fair support in the record the trial court's conclusion that there was practically no publicity given to the case between the first and second trials. See 710 F. 2d 956, 969, n. 21 (1983). The federal court suggested that the record on habeas of the publicity after the first trial and during the second was more complete than the record considered by the trial court. *Ibid.*

The Court of Appeals also suggested that the trial court's view that there was little talk in public concerning the second trial was undermined by the *voir dire* testimony that there had been public discussion of the case, particularly in the last weeks before retrial. *Id.*, at 969, n. 22. The court discounted, as of limited significance, the trial court's point that few spectators had attended the trial, since Yount did not allege prejudice arising from the " 'circus atmosphere' " in the courtroom. *Ibid.*

[2] One hundred twenty-five of the original 292 veniremen were excused because they had not been chosen properly. Four others were dismissed for cause before they were questioned on the case.

some time they had formed an opinion as to Yount's guilt.[3] The court thought that many of the jurors had given equivocal responses when asked whether they could set aside these opinions, and that one juror, a Mr. Hrin, and both alternates would have required evidence to overcome their beliefs. The court concluded that "despite their assurances of impartiality, the jurors could not set aside their opinions and render a verdict based solely on the evidence presented." 710 F. 2d, at 972.[4]

Judge Garth concurred in the judgment. He declined to join the court's view that actual prejudice on the part of the jury might be inferred from pretrial publicity and the answers at *voir dire* of veniremen not selected for the jury. He wrote that "[a] thorough and skillfully conducted *voir dire* should be adequate to identify juror bias, even in a community saturated with publicity adverse to the defendant." *Id.*, at 979.[5] Judge Garth nevertheless concurred because in his view juror Hrin stated at *voir dire* that he would have required evidence to change his mind about Yount's

---

[3] The Court of Appeals noted that in *Irvin* 8 of 12 jurors had formed opinions of guilt.

[4] Judge Stern wrote a separate concurring opinion in which he suggested that the "constitutional standard which for 175 years has guided the lower courts" in this area be rejected. 710 F. 2d, at 972. Rather than hinge disqualification of a juror on whether he has a fixed opinion of guilt that he cannot lay aside, Judge Stern would bar any juror who admitted any opinion as to guilt. Moreover, no jury could be empaneled where more than 25% of the veniremen state that they held an opinion concerning the defendant's guilt. This would raise such doubts as to the sincerity of those who claimed no opinion as to suggest concealed bias, Judge Stern wrote.

[5] Judge Garth thought *Irvin* was distinguishable, because there "the trial court (which itself questioned the jurors challenged for cause) did not engage in a searching and thorough *voir dire*." 710 F. 2d, at 979. Rather, it merely credited the jurors' subjective opinions that each could render an impartial verdict notwithstanding his or her opinion. Judge Garth also noted that Yount challenged for cause only three of the actual jurors. In *Irvin*, the defendant challenged each of his 12 jurors for cause. *Irvin* v. *Dowd*, 359 U. S. 394, 398 (1959).

guilt. This stripped the defendant of the presumption of innocence.[6]

We granted certiorari, 464 U. S. 913 (1983), to consider, in the context of this case, the problem of pervasive media publicity that now arises so frequently in the trial of sensational criminal cases. We reverse the judgment of the Court of Appeals.

## II

As noted, the Court of Appeals rested its decision that the jury was not impartial on this Court's decision in *Irvin* v. *Dowd, supra.* That decision, a leading one at the time, held that adverse pretrial publicity can create such a presumption of prejudice in a community that the jurors' claims that they can be impartial should not be believed. The Court in *Irvin* reviewed a number of factors in determining whether the totality of the circumstances raised such a presumption. The Court noted, however, that the trial court's findings of impartiality might be overturned only for "manifest error." 366 U. S., at 723. The Court of Appeals in this case did not address this aspect of the *Irvin* decision.[7] Moreover, the

---

[6] Judge Garth stated that whether juror Hrin was unconstitutionally biased was a mixed question of law and fact under *Irvin.* 710 F. 2d, at 981. He therefore did not apply the presumption of correctness that is applicable to the factual findings of a state court in a federal habeas corpus proceeding, 28 U. S. C. § 2254(d).

[7] The Court of Appeals appears to have thought that two statements in *Irvin*—that a federal court must "independently evaluate" the *voir dire* testimony, and that the question of juror partiality is a mixed question of law and fact, 366 U. S., at 723—meant that there is no presumption of correctness owed to the trial court's finding that a jury as a whole is impartial. We note that *Irvin* was decided five years before Congress added to the habeas corpus statute an explicit presumption of correctness for state-court factual findings, see Pub. L. 89–711, 80 Stat. 1105–1106, and two years before this Court's opinion in *Townsend* v. *Sain,* 372 U. S. 293 (1963), provided the guidelines that were later codified. It may be that there is little practical difference between the *Irvin* "manifest error" standard and the "fairly supported by the record" standard of the amended habeas statute. See 28 U. S. C. § 2254(d). In any case, we do not think the

court below, in concentrating on the factors discussed at length in *Irvin*, failed to give adequate weight to other significant circumstances in this case. In *Irvin*, the Court observed that it was during the six or seven months immediately preceding trial that "a barrage of newspaper headlines, articles, cartoons and pictures was unleashed against [the defendant]." *Id.*, at 725. In this case, the extensive adverse publicity and the community's sense of outrage were at their height prior to Yount's first trial in 1966. The jury selection for Yount's second trial, at issue here, did not occur until four years later, at a time when prejudicial publicity was greatly diminished and community sentiment had softened. In these circumstances, we hold that the trial court did not commit manifest error in finding that the jury as a whole was impartial.

The record reveals that in the year and a half from the reversal of the first conviction to the start of the second *voir dire* each of the two Clearfield County daily newspapers published an average of less than one article per month. App. 642a–657a; Record, Ex. P–1–v to P–1–kk, P–2. More important, many of these were extremely brief announcements of the trial dates and scheduling such as are common in rural newspapers. *E. g.*, App. 653a–656a; Record, Ex. P–1–ff, P–1–ii, P–1–jj. The transcript of the *voir dire* contains numerous references to the sparse publicity and minimal public interest prior to the second trial. *E. g.*, App. 43a, 98a, 100a; Tr. (Nov. 4, 1970) 27–28, 90, 191, 384, 771, 829, 1142. It is true that during the *voir dire* the newspapers published articles on an almost daily basis, but these too were purely factual articles generally discussing not the crime or prior prosecution, but the prolonged process of jury selection. App. 658a–671a. In short, the record of publicity in the

habeas standard is any less stringent. Since we uphold the state court's findings in this case under *Irvin*'s "manifest error" standard, we do not need to determine whether the subsequent development of the law of habeas corpus might have required a different analysis or result in that case.

months preceding, and at the time of, the second trial does not reveal the "barrage of inflammatory publicity immediately prior to trial," *Murphy* v. *Florida*, 421 U. S. 794, 798 (1975), amounting to a "huge . . . wave of public passion," *Irvin*, 366 U. S., at 728, that the Court found in *Irvin*.

The *voir dire* testimony revealed that this lapse in time had a profound effect on the community and, more important, on the jury, in softening or effacing opinion. Many veniremen, of course, simply had let the details of the case slip from their minds. *E. g.*, App. 194a; Tr. 33, 284, 541–544, 991. In addition, while it is true that a number of jurors and veniremen testified that at one time they had held opinions, for many, time had weakened or eliminated any conviction they had had. See, *e. g.*, App. 98a–100a (juror number 7), 128a (juror number 8); Tr. 384–385, 398–399, 831, 897 (semble), 1075–1076, 1144; see also App. 164a–166a (juror number 10).[8]

---

[8] The testimony of juror number 7, Martin Karetski, during examination by defense counsel is illustrative:

"Q. You have heard the matter discussed over the years?

"A. In the past few years I haven't heard too much about it.

"Q. In 1966 when the matter came up before you knew about it then?

"A. Yes sir.

"Q. And just recently when this matter was coming up again, I presume?

"A. What I have read in the paper again.

"Q. And you have heard other people discuss it?

"A. Not too many so far.

"Q. You have heard other people express opinions about it?

"A. Not too many of those so far too.

"Q. Back around '66, did you?

"A. Yes in '66.

. . . . .

"Q. . . . I assume you had an opinion as to [Mr. Yount's] guilt or innocence [in 1966]?

"A. I had an opinion yes.

"Q. Do you have a opinion today as to his guilt or innocence?

"A. It's been a long time ago and I'm not sure now. It was in the paper he plead *[sic]* not guilty.

. . . . .

The same is true of the testimony of the jurors and veniremen who were seated late in the process and therefore were subjected to some of the articles and broadcasts disseminated daily during the *voir dire:*[9] the record suggests that their passions had not been inflamed nor their thoughts biased by the publicity. *E. g., id.,* at 176a–177a, 150a–151a; Tr. 771, 959, 1027.

That time soothes and erases is a perfectly natural phenomenon, familiar to all. See *Irvin* v. *Dowd,* 271 F. 2d 552, 561 (CA7 1959) (Duffy, J., dissenting) (A continuance should have been granted because "[t]he passage of time is a great healer," and public prejudice might have "subsid[ed]"), rev'd, 366 U. S. 717 (1961); see also *Murphy, supra,* at 802; *Beck* v. *Washington,* 369 U. S. 541, 556 (1962). Not all members of the venire had put aside earlier prejudice, as the *voir dire* disclosed. They retained their fixed opinions, and were disqualified. But the testimony suggests that the *voir dire* resulted in selecting those who had forgotten or would need to be persuaded again.[10]

---

"Q. Let me ask you this then. In case you do have an opinion, could you wipe it out of your mind—erase it out of your mind before you would take a seat in the jury box and hear whatever evidence you might hear?

"A. As it is right now I have no opinion now—four or five years ago I probably did but right now I don't.

. . . . .

"Q. What happened Mr. Karetski, between then and now to eliminate that opinion if you can tell me?

"A. Well, as far as I'm concerned there wasn't much in the paper about it and it sort of slipped away from thought." App. 98a–100a.

[9] Jurors were sequestered as they were chosen.

[10] As noted, the *voir dire* in this case was particularly extensive. It took 10 days to pick 14 jurors from 292 veniremen. In *Irvin* it took 8 days to pick 14 jurors from 430 veniremen.

Contrary to Judge Garth's surmise, 710 F. 2d, at 979, however, the *voir dire* interviews quoted in the petitioner's brief in *Irvin* do not appear to be significantly less probing than those here. See Brief for Petitioner in *Irvin* v. *Dowd,* O. T. 1960, No. 41, pp. 18–59. It should also be noted that the *voir dire* in *Irvin,* like that here, was conducted largely by counsel for

The Court of Appeals below thought that the fact that the great majority of veniremen "remembered the case" showed that time had not served "to erase highly unfavorable publicity from the memory of [the] community." 710 F. 2d, at 969. This conclusion, without more, is essentially irrelevant. The relevant question is not whether the community remembered the case, but whether the jurors at Yount's trial had such fixed opinions that they could not judge impartially the guilt of the defendant. *Irvin*, 366 U. S., at 723. It is not unusual that one's recollection of the fact that a notorious crime was committed lingers long after the feelings of revulsion that create prejudice have passed. It would be fruitless to attempt to identify any particular lapse of time that in itself would distinguish the situation that existed in *Irvin*.[11] But it is clear that the passage of time between a first and a second trial can be a highly relevant fact. In the circumstances of this case, we hold that it clearly rebuts any presumption of partiality or prejudice that existed at the time of the initial trial. There was fair, even abundant, support for the trial court's findings that between the two trials of this case there had been "practically no publicity given to this matter through the news media," and that there had not been "any great effect created by any publicity." App. 268a, 265a.

---

each side, rather than the judge. The only significant difference in the procedures followed here and in *Irvin* is that the veniremen here were brought into the courtroom alone for questioning, while it appears that those in *Irvin* were questioned in front of all those remaining in the panel. This is not an insubstantial distinction, as the Court suggested in *Irvin*, 366 U. S., at 728, but we do not find it controlling.

[11] In *Murphy* v. *Florida*, 421 U. S. 794 (1975), the defendant—widely known as "Murph the Surf"—relied heavily on *Irvin*. The record of damaging publicity preceding his trial was at least as extreme as that in this case. Nevertheless, we found the record there distinguishable from *Irvin*. We noted that the extensive publication of news articles about Murphy largely had ceased some seven months before the jury was selected. 421 U. S., at 802. *Murphy* involved a lapse in publicity prior to the defendant's first trial; there was no second trial in that case.

## III

Yount briefly argues here that juror Hrin, as well as the two alternates, were erroneously seated over his challenges for cause. Brief for Respondent 32. There is substantial doubt whether Yount properly raised in his petition for habeas corpus the claim that the trial court erroneously denied his challenge for cause to juror Hrin. Compare 710 F. 2d, at 966, n. 18, with *id.*, at 977, and n. 4 (Garth, J., concurring). And there is no evidence that the alternate jurors, who did not sit in judgment, actually talked with the other jurors during the 4-day trial. But Judge Garth in the court below based his concurrence on the view that Hrin would have required Yount to produce evidence to overcome his inclination to think the accused was guilty, and the majority of the panel thought that the 4-day association between the alternates and the other jurors "operate[d] to subvert the requirement that the jury's verdict be based on evidence developed from the witness stand," *id.*, at 971, n. 25. Therefore, we will consider briefly the claims as to all three jurors.

It was the view of all three Court of Appeals judges that the question whether jurors have opinions that disqualify them is a mixed question of law and fact. See *id.*, at 968, n. 20, 981. Thus, they concluded that the presumption of correctness due a state court's factual findings under 28 U. S. C. § 2254(d) does not apply. The opinions below relied for this proposition on *Irvin* v. *Dowd*, 366 U. S., at 723. *Irvin* addressed the partiality of the trial jury as a whole, a question we discuss in Part II, *supra.* We do not think its analysis can be extended to a federal habeas corpus case in which the partiality of an individual juror is placed in issue. That question is not one of mixed law and fact. Rather it is plainly one of historical fact: did a juror swear that he could set aside any opinion he might hold and decide the case on the evidence, and should the juror's protestation of impartiality have been believed. Cf. *Rushen* v. *Spain*, 464 U. S. 114,

120 (1983) (state-court determination that juror's delibera-
tions were not biased by *ex parte* communications is a finding
of fact).[12]

---

[12] There are, of course, factual and legal questions to be considered in
deciding whether a juror is qualified. The constitutional standard that a
juror is impartial only if he can lay aside his opinion and render a verdict
based on the evidence presented in court is a question of federal law, see
*Irvin*, 366 U. S., at 723; whether a juror can in fact do that is a determina-
tion to which habeas courts owe special deference, see *Rushen*, 464 U. S.,
at 120. Cf. *Marshall* v. *Lonberger*, 459 U. S. 422, 431–432 (1983) (similar
analysis as to whether a guilty plea was voluntary). See also *Reynolds* v.
*United States*, 98 U. S. 145, 156 (1879) (whether a juror should be disquali-
fied is a question involving both a legal standard and findings of fact; the
latter may be set aside only for manifest error).

The dissent misreads the Court's opinion in *Reynolds* v. *United States*.
*Post*, at 1050–1052, and nn. 6 and 7. *Reynolds* was decided some 87 years
before the presumption of correctness for factual findings was added to
28 U. S. C. § 2254. The Court clearly did not attach the same significance
to the phrase "a question of mixed law and fact" that we do today under
modern habeas law. It recognized that juror-disqualification questions
may raise both a question of law—whether the correct standard was ap-
plied—and a question of fact. Whether an opinion expressed by a juror
was such as to meet the legal standard for disqualification was viewed
as a question of fact as to which deference was due to the trial court's
determination. This is apparent from the language quoted by the dissent,
which notes that while the question is one of "mixed law and fact," it is
"to be tried, as far as the facts are concerned, like any other issue of that
character, upon the evidence. The finding of the trial court upon that
issue ought not to be set aside by a reviewing court, unless the error is
manifest." 98 U. S., at 156. Plainly, factual findings were to be consid-
ered separately from the legal standard applied, and deference was due to
those findings. This is also apparent from the following passage:

"[T]he manner of the juror while testifying is oftentimes more indicative of
the real character of his opinion than his words. That is seen below, but
cannot always be spread upon the record. Care should, therefore, be
taken in the reviewing court not to reverse the ruling below upon such *a
question of fact*, except in a clear case." *Id.*, at 156–157 (emphasis added).

Taken together, these passages plainly show that the "character of [a ju-
ror's] opinion" was considered a question of fact. Contrary to the sugges-
tion of the dissent, *post*, at 1050, n. 6, the factual question was not limited

There are good reasons to apply the statutory presumption of correctness to the trial court's resolution of these questions. First, the determination has been made only after an often extended *voir dire* proceeding designed specifically to identify biased veniremen. It is fair to assume that the method we have relied on since the beginning, *e. g., United States* v. *Burr*, 25 F. Cas. 49, 51 (No. 14,692g) (CC Va. 1807) (Marshall, C. J.), usually identifies bias.[13] Second, the determination is essentially one of credibility, and therefore largely one of demeanor. As we have said on numerous occasions, the trial court's resolution of such questions is entitled, even on direct appeal, to "special deference." *E. g., Bose Corp.* v. *Consumers Union of U. S., Inc.*, 466 U. S. 485, 500 (1984). The respect paid such findings in a habeas proceeding certainly should be no less. See *Marshall* v. *Lonberger*, 459 U. S. 422, 434–435 (1983).[14]

Thus the question is whether there is fair support in the record for the state courts' conclusion that the jurors here would be impartial. See 28 U. S. C. § 2254(d)(8). The testi-

---

to whether the juror was telling the truth, but included discovering the "real character" of any opinion held. Deference was due to the trial court's conclusions on that question.

[13] Accord, *In re Application of National Broadcasting Co.*, 209 U. S. App. D. C. 354, 362, 653 F. 2d 609, 617 (1981) ("[V]oir dire has long been recognized as an effective method of rooting out such bias, especially when conducted in a careful and thoroughgoing manner"); *United States* v. *Duncan*, 598 F. 2d 839, 865 (CA4), cert. denied, 444 U. S. 871 (1979); *Calley* v. *Callaway*, 519 F. 2d 184, 209, n. 45 (CA5 1975) (en banc) (citing cases), cert. denied *sub nom. Calley* v. *Hoffman*, 425 U. S. 911 (1976). But cf. *Smith* v. *Phillips*, 455 U. S. 209, 222, and n. (1982) (O'CONNOR, J., concurring) (describing situations in which state procedures are inadequate to uncover bias); *Rideau* v. *Louisiana*, 373 U. S. 723 (1963) (same).

[14] Demeanor plays a fundamental role not only in determining juror credibility, but also in simply understanding what a potential juror is saying. Any complicated *voir dire* calls upon lay persons to think and express themselves in unfamiliar terms, as a reading of any transcript of such a proceeding will reveal. Demeanor, inflection, the flow of the questions and answers can make confused and conflicting utterances comprehensible.

mony of each of the three challenged jurors is ambiguous and at times contradictory. This is not unusual on *voir dire* examination, particularly in a highly publicized criminal case. It is well to remember that the lay persons on the panel may never have been subjected to the type of leading questions and cross-examination tactics that frequently are employed, and that were evident in this case. Prospective jurors represent a cross section of the community, and their education and experience vary widely. Also, unlike witnesses, prospective jurors have had no briefing by lawyers prior to taking the stand. Jurors thus cannot be expected invariably to express themselves carefully or even consistently. Every trial judge understands this, and under our system it is that judge who is best situated to determine competency to serve impartially. The trial judge properly may choose to believe those statements that were the most fully articulated or that appeared to have been least influenced by leading.

The *voir dire* examination of juror Hrin was carefully scrutinized by the state courts and the Federal District Court, as he was challenged for cause and was a member of the jury that convicted the defendant. We think that the trial judge's decision to seat Hrin, despite early ambiguity in his testimony, was confirmed after he initially denied the challenge. Defense counsel sought and obtained permission to resume cross-examination. In response to a question whether Hrin could set his opinion aside before entering the jury box or would need evidence to change his mind, the juror clearly and forthrightly stated: "I think I could enter it [the jury box] with a very open mind. I think I could . . . very easily. To say this is a requirement for some of the things you have to do every day." App. 89a. After this categorical answer, defense counsel did not renew their challenge for cause. Similarly, in the case of alternate juror Pyott, we cannot fault the trial judge for crediting her earliest testimony, in which she said that she could put her opinion aside "[i]f [she] had to," rather than the later testimony in

which defense counsel persuaded her that logically she would need evidence to discard any opinion she might have. *Id.*, at 246a, 250a–252a. Alternate juror Chincharick's testimony is the most ambiguous, as he appears simply to have answered "yes" to almost any question put to him. It is here that the federal court's deference must operate, for while the cold record arouses some concern, only the trial judge could tell which of these answers was said with the greatest comprehension and certainty.

## IV

We conclude that the *voir dire* testimony and the record of publicity do not reveal the kind of "wave of public passion" that would have made a fair trial unlikely by the jury that was empaneled as a whole. We also conclude that the ambiguity in the testimony of the cited jurors who were challenged for cause is insufficient to overcome the presumption of correctness owed to the trial court's findings. We therefore reverse.

*It is so ordered.*

JUSTICE MARSHALL took no part in the decision of this case.

JUSTICE STEVENS, with whom JUSTICE BRENNAN joins, dissenting.

On page 1 of its opinion the Court carefully states certain facts that give the reader a strong feeling about how this case should be decided. In 1966, Jon Yount confessed that he was responsible for the brutal killing of an 18-year-old high school student. At his first trial in 1966 he testified that he had been temporarily insane at the time, but the jury did not believe him. He was found guilty of rape, as well as murder. These facts were not admissible in evidence at his second trial. What impact, if any, did these inadmissible facts have upon 12 jurors, the 2 alternate jurors, and indeed the trial judge, who listened to the evidence at Yount's second trial in 1970? The Court is satisfied that "community sentiment had

softened," *ante*, at 1032, and that the trial judge "did not commit manifest error in finding that the jury as a whole was impartial," *ibid.*, because of the passage of time between 1966 and 1970, and because we all know that "time soothes and erases," *ante*, at 1034.

In order to explain why I disagree with the Court's assessment of the case, it is necessary to enlarge upon its summary of the news coverage of the crime and its aftermath, to supplement its discussion of the examination of the jurors, and to explain why the Court of Appeals properly rejected the trial judge's conclusion that the jury as a whole was impartial. Next, I will discuss my disagreement with the Court's conclusion regarding juror Hrin. Finally, I shall add a word about the more profound issue that a case of this kind raises.

## I

Because the Court places such great emphasis on the fact that "this lapse in time had a profound effect on the community and, more important, on the jury, in softening or effacing opinion," *ante*, at 1033, it is important to note that there were, in effect, three chapters in the relevant news coverage: the stories about the crime itself and the first trial in 1966; the stories and events surrounding the State Supreme Court's reversal of the first conviction in 1969; and the stories that were published in 1970 immediately before the second trial began and while the jury was being selected.

The relevant events all occurred in Clearfield County, Pa., where both Yount and the victim lived. It is a rural county, with a population of about 70,000, served by two newspapers with a combined circulation of about 25,000. Not surprisingly, both newspapers gave front-page coverage to the homicide, the pretrial proceedings, and the trial itself. In numerous editions of the DuBois Courier Express, the newspaper carried banner headlines on the front page, news stories and feature articles. App. 520a–641a; Record, Ex. P–1–a, P–1–b, P–1–d, P–1–f to P–1–t. The Clearfield Progress evaluated the trial as the "Top News Story of

1966." Record, Ex. P–2, p. 2. Both papers reported that public interest in the proceedings was "unprecedented." 710 F. 2d 956, 962 (CA3 1983). Moreover, the case also received radio and television coverage, see, *e. g.*, Tr. (Nov. 4, 1970) 64 (juror number 1), 142, 220, 277, and, according to the Court of Appeals, was publicized in out-of-state and national publications. 710 F. 2d, at 962, n. 6.

The articles were extremely detailed.[1] As the Court of Appeals noted, they "related in full [Yount's] detailed written confessions as well as his testimony at trial retelling the homicide. They also detailed [Yount's] defense of temporary insanity, the charge and evidence of rape, and finally [Yount's] conviction on October 7, 1966, of both rape and first-degree murder." *Id.*, at 963; see, *e. g.*, App. 538a–540a, 603a–606a. As this Court notes, "the extensive adverse publicity and the community's sense of outrage were at their height prior to Yount's first trial in 1966," *ante*, at 1032.

In 1969, a divided Supreme Court of Pennsylvania reversed Yount's conviction and ordered a new trial. *Commonwealth* v. *Yount*, 435 Pa. 276, 256 A. 2d 464 (1969), cert. denied, 397 U. S. 925 (1970). This event did not pass unnoticed in Clearfield County. To the contrary, banner headlines announced the reversal. App. 642a; Record, Ex. P–1–v. The local press reprinted the entire dissenting opinion. App. 644a; Record, Ex. P–1–x. And, as the Court of Appeals stated, "a local radio program became a forum in

---

[1] The "details" of the articles prompted two citizens to write letters to the Courier Express. One letter complained that the paper had "fanned the already poisoned atmosphere of malicious gossip" by putting a picture of the corpse on the front page and by the "repetitive use of gory details." The author added that he thought he "was looking at the National Enquirer." The second letter noted: "Emotional editorializing most certainly has it's *[sic]* place in reporting, but I strenuously object to such when it appears in headline stories. . . . [D]escriptive words that do much to sell newspapers and stir emotions discredit headline reporting and tend to prejudice the suspect regardless of degree of guilt." Record, Ex. P–1–e.

which callers expressed their hostility to [Yount]." 710 F. 2d, at 963. This evidence contradicts the easy assumption that "community sentiment had softened," *ante*, at 1032.

In 1970, Yount was returned to Clearfield County for a retrial in the same courtroom before the same judge who had presided at the first trial—the judge whose erroneous rulings had made the second trial necessary. Yount moved for a change of venue on the ground that the continuing discussion of the case among local residents made it impossible for him to receive a fair trial in Clearfield County. In response the prosecutor argued that a change of venue would be pointless because the case had been so widely publicized throughout the State. The trial court denied the motion, explaining that the recent newspaper items had consisted of purely factual reporting "without editorial comment of any kin[d]." App. 260a. This venue ruling generated a front-page article. *Id.*, at 654a; Record, Ex. P–1–gg. Additionally, during the subsequent *voir dire*, the selection of jurors merited numerous articles and sometimes merited a profile on the juror selected. App. 658a–659a, 661a–663a, 664a–671a; Record, Ex. P–1–ll, P–1–nn to P–1–vv; P–2.

The *voir dire* testimony of one prospective juror, the wife of a minister, sheds a revelatory light on the character of local sentiment on the eve of the second trial. After acknowledging that she had heard many opinions about the case, she was asked:

"Q. Would your presence in serving as a juror create a difficulty in your parish?

"A. Why yes—when people heard my name on for this—countless people of the church have come to me and said they hoped I would take—the stand I would take in case I was called. I have had a prejudice built up from the people in the church.

"Q. Is this prejudice, has it been adverse to Mr. Yount?

"A. Yes it was. They all say he had a fair trial and he got a fair sentence. He's lucky he didn't get the chair.

. . . . .

"[T]he church people—I haven't asked for any of this but they discuss it in every group—but they say now since you are chosen and you will be there we expect you to follow through.

"Q. Notwithstanding what the Court would tell you, you feel you would be subject to the retributions or retaliation of these people—

"A. I think I would hear about it." App. 25a–27a.

The minister's wife was excused. Her testimony, as well as that of other veniremen who were excused, not only repudiates the notion that the community had all but forgotten the Yount case, but also suggests that some veniremen might have been tempted to understate their recollection of the case because they felt they had a duty to their neighbors "to follow through."[2] In all events, the record clearly establishes that the case was still a "cause célèbre" in Clearfield County in 1970.

## II

Even if all the *voir dire* testimony is accepted at face value, it is difficult to understand how a neutral observer could conclude that the jury as a whole was impartial. Before referring to the 12 jurors and 2 alternates who were selected, it is useful to describe the attitude that pervaded the entire venire.

The jury selection took 10 days. *Id.*, at 745a; 710 F. 2d, at 963, 975. Out of an original total of 292 veniremen, the court dismissed 129 because they had been chosen improperly, Tr. 685–686, or had a valid reason for not serving. *Id.*, at 117–118, 492, 1039, 1060–1061. Of the remaining 163 who

---

[2] As the Court of Appeals pointed out, another prospective juror testified that his opinion had been erased by the passage of time, but his daughter-in-law testified that he had left for jury duty voicing great animosity toward Yount. 710 F. 2d, at 964; App. 766a.

were questioned, all but 2 had read or heard about the case, *id.*, at 127a–128a, 370a–371a (juror number 4); all but 42 were dismissed for cause. 710 F. 2d, at 963. Of the 121 dismissed for cause, 96 testified that they had firm opinions that could not be changed regardless of what evidence might be presented. Twenty-one others testified that they could only change their opinion if Yount could convince them to do so. In addition, there were nine veniremen who were unsuccessfully challenged for cause who also testified that they had opinions that they could change only if Yount could convince them to do so.[3] *Id.*, at 963–964. Thus, as Judge Hunter summarized for the Court of Appeals:

> "When we combine those nine with the 117 veniremen dismissed for cause, we find that a total of 126 out of the 163 veniremen questioned on the case were willing to admit on voir dire that they would carry their opinion[s] into the jury box."[4] *Id.*, at 964.

Turning to the jurors who were actually selected, Judge Hunter accurately noted that "the publicity had reached all but one of the twelve jurors and two alternates finally empanelled." *Ibid.* (footnote omitted); App. 32a, 43a, 71a, 83a, 98a, 120a, 149a, 163a, 176a, 193a, 210a, 235a, 250a. Juror number 1 noted that "it was pretty hard to be here in Clearfield County and not read something in the paper" about the case; that she had read newspaper stories and lis-

---

[3] The Court of Appeals added:

"Petitioner peremptorily challenged six of those nine veniremen, one was seated as a juror, and the remaining two were seated as alternates after petitioner had exhausted his peremptory challenges." 710 F. 2d, at 964, n. 13.

[4] At this point, the Court of Appeals added the following footnote:

"In addition, we note that twelve other veniremen stated that they had had an opinion at one time but claimed they would not carry it into the jury box. One of the twelve veniremen was dismissed for cause, six were peremptorily challenged by petitioner, and five were seated as jurors." *Id.*, at 964, n. 14.

tened to radio and television stories about the case; and that she had heard the case being discussed by other people. *Id.*, at 32a. Juror number 2 testified that he had read about the case in the newspapers; that "[y]ou could hardly miss it on [radio and television] news"; and that he had formed an opinion about the case. *Id.*, at 43a–44a. The person seated as juror number 3[5] stated that he had read about the case in the newspapers years before the *voir dire* but that he had not formed an opinion. *Id.*, at 210a–211a. Juror number 4, a newcomer to the area, had never heard of the case. *Id.*, at 57a–58a. Juror number 5 "remembered that they had said he was guilty before" and wondered why they were having another trial. *Id.*, at 73a. James F. Hrin, juror number 6, testified that he had an opinion about the case and that he would require the presentation of evidence to change it. *Id.*, at 83a, 85a. He noted that "[i]t's rather difficult to live in DuBois and get the paper and find out what people are talking about—at least the local . . . people without having some opinion or at least reserving some opinion." *Id.*, at 88a. Juror number 7 stated that he had read about the case; that he had formed an opinion; and that he was not sure whether he still had an opinion. *Id.*, at 98a–99a. Juror number 8 testified that she had heard others express opinions concerning the case and she only had an opinion "on just what he said himself—that he was guilty." *Id.*, at 120a, 125a. Juror number 9 stated that she had felt that petitioner was guilty but that presently she would have to hear both sides before forming an opinion. *Id.*, at 150a. Juror number 10 had heard people express their opinions and had on occasion expressed his own opinion about the case. He also stated that he would listen to both sides before forming a present opinion. *Id.*, at 164a–165a. Juror number 11 testified that he had read newspaper accounts of the case but that he had

[5] The person initially selected as juror number 3 was not able to sit because of personal reasons. Tr. 1060–1061.

formed no opinion. *Id.*, at 177a. Juror number 12 had read about the case but she had formed no opinion. *Id.*, at 193a–194a. Two alternates were seated over Yount's challenges for cause. Alternate number 1 stated that he had heard people express opinions and ideas about the case; that he had expressed an opinion; that he still had a firm and fixed opinion based on what he read in the newspapers; and that he would require evidence to be presented before he could put his opinion out of his mind. *Id.*, at 235a–240a. Alternate number 2 stated that she had formed a definite opinion and that she would require the production of evidence to change her mind. *Id.*, at 251a–252a.

The totality of these circumstances convinces me that the trial judge committed manifest error in determining that the jury as a whole was impartial. The trial judge's comment that there was little talk in public about the second trial, *id.*, at 264a, is plainly inconsistent with the evidence adduced during the *voir dire.* Similarly, the trial court's statement that "there was practically no publicity given to this matter through the news media . . . except to report that a new trial had been granted by the Supreme Court," *id.*, at 268a, simply ignores at least 55 front-page articles that are in the record. Record, Ex. P–1, P–2. Further, the trial judge's statement that "almost all, if not all, [of the first 12] jurors . . . had no prior or present fixed opinion," App. 264a, is manifestly erroneous; a review of the record reveals that 5 of the 12 had acknowledged either a prior or a present opinion. *Id.*, at 43a–44a, 83a, 98a–99a, 150a, 164a–165a. The trial judge's "practically no publicity" statement also ignores the first-trial details within the news stories. These included Yount's confessions, testimony, and conviction of rape—all of which were outside of the evidence presented at the second trial. See *id.*, at 643a–644a, 650a, 655a; Record, Ex. P–1–w, P–1–x, P–1–z, P–1–cc, P–1–hh. Under these circumstances, I do not believe that the jury was capable of deciding the case solely on the evidence before it. *Smith* v. *Phillips,* 455

U. S. 209, 217 (1982) ("Due process means a jury capable and willing to decide the case solely on the evidence before it").

### III

The Court today also rejects Yount's claim that juror Hrin was erroneously seated over his challenge for cause. Before explaining why I disagree with this conclusion, it is necessary to set forth a more complete version of Hrin's *voir dire* testimony than is set forth by the Court.

Hrin, in response to the prosecution's questioning, gave the following testimony:

"Q. Have you formed any opinion as to the guilt or innocence of Mr. Yount?

"A. To the degree that it was written up in the papers, yes.

"Q. Is this a fixed opinion on your part?

"A. This is sort of difficult to answer. Fixed?

"Q. Let me ask—if you were to be selected as a juror in this case and take the jury box, could you erase or remove the opinion you now hold and render a verdict based solely on the evidence and law produced at this trial?

"A. It is very possible. I wouldn't say for sure.

"Q. Do you think you could?

"A. I think I possibly could.

"Q. Then the opinion you hold is not necessarily a fixed and immobile opinion?

"A. I would say not, because I work at a job where I have to change my mind constantly.

"Q. Would you be able to change your mind regarding your opinion before becoming a juror in this case. That's the way I must have you answer the question.

"A. If the facts were so presented I definitely could change my mind.

"Q. Would you say you could enter the jury box presuming him to be innocent?

"A. It would be rather difficult for me to answer.

"Q. Can you enter the jury box with an open mind prepared to find your verdict on the evidence as presented at trial and the law . . . presented by the Judge?

"A. That I could do." App. 83a–84a.

Yount's counsel elicited further testimony through cross-examination:

"Q. Did I understand Mr. Hrin you would require some—you would . . . require evidence or something before you could change your opinion you now have?

"A. Definitely. If the facts show a difference from what I had originally—had been led to believe, I would definitely change my mind.

"Q. But until you're shown those facts, you would not change your mind—is that your position?

"A. Well—I have nothing else to go on.

"Q. I understand. Then the answer is yes—you would not change your mind until you were presented facts?

"A. Right, but I would enter it with an open mind.

"Q. In other words, you're saying that while facts were presented you would keep an open mind and after that you would feel free to change your mind?

"A. Definitely.

"Q. But you would not change your mind until the facts were presented?

"A. Right." Id., at 85a–86a.

Yount's counsel subsequently challenged for cause; the court denied the challenge because Hrin "said he could go in with an open mind." Id., at 86a.

First, even if we regard the relevant rulings as findings of fact, Hrin's testimony clearly is sufficient to overcome the presumption of correctness due a state court's factual findings under 28 U. S. C. § 2254(d). The state court's determination is not fairly supported by the record. Hrin not only

indicated that he had a previous opinion as to Yount's guilt or innocence, but also that he required evidence produced at trial to dispel that opinion. Further, he stated—pursuant to the prosecution's questioning—that "[i]t would be rather difficult . . . to answer" whether he could enter the jury box presuming Yount's innocence. Under these circumstances, I am convinced that the trial court improperly empaneled Hrin.

More important, however, I believe the Court's analysis regarding whether a juror has a disqualifying opinion is flawed. The Court begins by stating that such a question is one of historical fact, *ante*, at 1036. It then concludes, simply, that this factual finding is entitled to 28 U. S. C. § 2254(d)'s presumption of correctness. Finally, it acknowledges that "[t]here are, of course, factual and legal questions to be considered in deciding whether a juror is qualified," *ante*, at 1037, n. 12, and cites as one authority *Reynolds* v. *United States*, 98 U. S. 145 (1879).[6]

---

[6] The Court attempts to justify its treatment of *Reynolds* by quoting from a passage in that case that begins with: "[T]he manner of the juror while testifying is oftentimes more indicative of the real character of his opinion than his words." *Ante*, at 1037, n. 12 (quoting 98 U. S., at 156–157). The excerpt from *Reynolds* quoted by the Court dealt with the question whether a juror's testimony was truthful—specifically whether a prospective juror was falsely seeking to disqualify himself. In this case the question is whether Hrin's testimony, including his acknowledged opinion about Yount's guilt, raised a presumption of partiality. Whether the testimony of a witness is true or false is a question of fact; whether his statement raises a presumption of partiality is a mixed question of law and fact. The fully quoted relevant passage of *Reynolds* demonstrates the former point:

"The reading of the evidence leaves the impression that the juror had some hypothetical opinion about the case, but it falls far short of raising a manifest presumption of partiality. In considering such questions in a reviewing court, we ought not to be unmindful of the fact we have so often observed in our experience, that jurors not unfrequently seek to excuse themselves on the ground of having formed an opinion, when on examination, it turns out that no real disqualification exists. *In such cases* the manner of the juror while testifying is oftentimes more indicative of the

Contrary to the Court, I believe that whether a juror has a disqualifying opinion is a mixed question of law and fact. The proper starting point of analysis is *Reynolds* v. *United States, supra.* In that case, the defendant excepted to the trial court's decision to reject several challenges for cause that were based on juror testimony during *voir dire.* *Id.*, at 146–147. This Court upheld the trial court's decision. *Id.*, at 157. Before reaching its ultimate conclusion, the Court stated:

> "The theory of law is that a juror who has formed an opinion cannot be impartial. Every opinion which he may entertain need not necessarily have this effect. In these days of newspaper enterprise and universal education, every case of public interest is almost, as a matter of necessity, brought to the attention of all the intelligent people in the vicinity, and scarcely any one can be found among the best fitted for jurors who has not read or heard of it, and who has not some impression or some opinion in respect to its merits. It is clear, therefore, that upon the trial of the issue of fact raised by a challenge for such cause the court will practically be called upon to determine whether the nature and strength of the opinion formed are such as in law necessarily to raise the presumption of partiality. The question thus presented is one of mixed law and fact, and to be tried, as far as the facts are concerned, like any other issue of that

real character of his opinion than his words. That is seen below, but cannot always be spread upon the record. Care should, therefore, be taken in the reviewing court not to reverse the ruling below upon *such a question* of fact except in a clear case." *Id.*, at 156–157 (emphasis added).

The Court also cites as authority *Rushen* v. *Spain*, 464 U. S. 114 (1983) *(per curiam),* and *Marshall* v. *Lonberger*, 459 U. S. 422 (1983). Neither of those cases was correctly decided. Moreover, the latter case is plainly inapplicable because it involved the voluntariness of guilty pleas, not juror partiality. The former involved an allegation of juror partiality that arose after the trial began.

character, upon the evidence. The finding of the trial court upon that issue ought not to be set aside by a reviewing court, unless the error is manifest." *Id.*, at 155–156.

*Irvin* v. *Dowd*, 366 U. S. 717 (1961), extended *Reynolds* to habeas corpus proceedings. Initially, *Irvin* noted that a presumption of a prospective juror's impartiality is not rebutted "if the juror can lay aside his impression or opinion and render a verdict based on the evidence presented in court." 366 U. S., at 723. Next, the Court affirmed that a proper inquiry may demonstrate "'whether the nature and strength of the opinion formed are such as in law necessarily . . . raise the presumption of partiality,'" *ibid.* (quoting *Reynolds* v. *United States, supra,* at 156), and that this inquiry is "'one of mixed law and fact.'" 366 U. S., at 723.

Thus, *Reynolds* and *Irvin* teach that the question whether a juror has an opinion that disqualifies is a mixed one of law and fact. Therefore, one cannot apply the presumption of correctness found in 28 U. S. C. § 2254(d) because the statutory language by definition applies only to the factual determinations of state courts. Applying the proper analytical framework, I believe that Hrin's testimony clearly raised a presumption of partiality. Therefore, the trial judge committed manifest error by improperly empaneling Hrin.[7]

There is a special reason to require independent review in a case that arouses the passions of the local community in which an elected judge is required to preside. Unlike an appointed federal judge with life tenure, an elected judge has reason to be concerned about the community's reaction to his

---

[7] The Court states that it "do[es] not think [*Irvin's*] analysis can be extended to a federal habeas corpus case in which the partiality of an individual juror is placed in issue." *Ante,* at 1036. The validity of *Irvin* (habeas corpus case) and of *Reynolds* (individual jurors), and the inapplicability of 28 U. S. C. § 2254(d), dispose of any meaningful reason not to "extend" these cases to federal habeas corpus cases in which the partiality of individual jurors is placed in issue.

disposition of highly publicized cases. Even in the federal judiciary, some Circuits have determined that it is sound practice to have the retrial of a case assigned to a different judge than the one whose erroneous ruling made another trial necessary; for though the risk that a judge will subconsciously strive to vindicate the result reached at the first trial may be remote, as long as human beings preside at trials, that possibility cannot be ignored entirely.

## IV

Two additional and somewhat disturbing questions merit comment: (1) why did this Court exercise its discretionary jurisdiction to review this case; and (2) even if the Court of Appeals' analysis of the case is entirely correct, why should those federal judges order the great writ of habeas corpus to issue for the benefit of a prisoner like Yount, who, it would seem, is guilty of a heinous offense?

The answer to the question why the Court grants certiorari in any given case usually involves considerations of both fact and law. It appears that the facts motivated the Court to select this case for plenary review. The facts that had such a motivating impact on this Court—that the conviction of a confessed murderer of a high school student had been set aside by an appellate court—also, I believe, must have had an emotional and unforgettable impact on the residents of Clearfield County. The desire to "follow through"—to do something about such an apparent miscarriage of justice—is difficult for judges as well as laymen to resist.[8]

It should not be forgotten that Yount has already been incarcerated for 18 years. If, as the Court of Appeals held, he

---

[8] As I recently noted, in 19 consecutive cases in which the Court exercised its discretion to decide a criminal case summarily, the Court made sure that an apparently guilty defendant was not given too much protection by the law. See *Florida* v. *Meyers*, 466 U. S. 380, 385–387, and n. 3 (1984). The string of consecutive summary victories for the prosecution now stands at 20. See *Massachusetts* v. *Upton*, 466 U. S. 727 (1984) *(per curiam)*.

has not yet been found guilty beyond a reasonable doubt in a fair trial, the possibility remains that he has already received a greater punishment than is warranted. Of much greater importance is our dedication to the principle that guilt or innocence of a criminal offense in our society is not to be decided by executive fiat or by popular vote. This is a principle that affords protection for every citizen in the United States. Justice Frankfurter stated this point in his concurrence in *Irvin* v. *Dowd:*

> "More than one student of society has expressed the view that not the least significant test of the quality of a civilization is its treatment of those charged with crime, particularly with offenses which arouse the passions of a community. One of the rightful boasts of Western civilization is that the State has the burden of establishing guilt solely on the basis of evidence produced in court and under circumstances assuring an accused all the safeguards of a fair procedure. These rudimentary conditions for determining guilt are inevitably wanting if the jury which is to sit in judgment on a fellow human being comes to its task with its mind ineradicably poisoned against him." 366 U. S., at 729.

I would affirm the judgment of the Court of Appeals.