David W. ALDRIDGE, Petitioner-Appellant,

v.

R.C. MARSHALL; Anthony J. Celebrezze, Jr., Attorney General of Ohio, Respondents-Appellees.

No. 84–3517.

United States Court of Appeals, Sixth Circuit.

Argued April 11, 1985.

Decided June 11, 1985.

presented in the briefs filed pursuant to the briefing schedule set up by the court.

J. Dean Carro (argued), Akron, Ohio, for petitioner-appellant.

William J. Steele (argued), Asst. Ohio Atty. Gen., Columbus, Ohio, for respondents-appellees.

·Before MERRITT and MILBURN, Circuit Judges, and BROWN, Senior Circuit Judge.

MILBURN, Circuit Judge.

Petitioner-appellant David W. Aldridge appeals the decision of the district court denying his petition for a writ of habeas corpus under 28 U.S.C. § 2254. Petitioner argues that multiple constitutional violations were committed in his Ohio state court trial on charges of kidnapping, aggravated robbery and aggravated murder. As we agree with the district court's holdings on all issues, we affirm.

## I.

## FACTS

At approximately 1:55 a.m. on June 7, 1979, Pamela Phillips pulled into the driveway of her North Kingsville, Ohio, home.

Having heard Pamela's van in the driveway, Pamela's mother looked out the window and watched as Pamela was abducted by a muscular man driving a black car. Approximately fifteen minutes later Pamela crawled onto the front steps of a nearby home where she died of multiple stab wounds.

On July 21, 1979, Pennsylvania police contacted the Ashtabula, Ohio, Sheriff's Department and Conneaut, Ohio, police concerning a suspect in a June 6, 1979, robbery which was unrelated, but similar in many respects, to the murder of Pamela Phillips.[1] The license number of the car used in the robbery was traced to petitioner Aldridge and at approximately 3:00 a.m. on July 22, 1979, Aldridge was arrested at his home. Aldridge consented to the search of his car, and evidence connecting him to the murder of Pamela Phillips was discovered. From sometime after his arrest until approximately 7:00 a.m. on July 22, 1979, Aldridge was questioned about the Pennsylvania robbery. Although Aldridge was temporarily transferred to the Lake County jail, he was ultimately returned to the Ashtabula jail on July 23, 1979, and questioning was resumed and a polygraph examination was given. Shortly after the polygraph was completed, Aldridge confessed to the murder, robbery and kidnapping of Pamela Phillips.

## PROCEDURAL HISTORY

Petitioner Aldridge was indicted by the Ashtabula County, Ohio, Grand Jury on one count of aggravated murder, one count of aggravated robbery, and one count of kidnapping. He entered pleas of not guilty to the robbery and kidnapping charges and a plea of not guilty by reason of insanity to the charge of aggravated murder. After a jury found him guilty on all charges, he was sentenced to terms of life imprisonment on the aggravated murder charge, from seven (7) to twenty-five (25) years on the aggravated robbery charge and from seven (7) to twenty-five (25) years on the

kidnapping charge. Aldridge appealed his conviction to the Ohio Court of Appeals where he raised thirteen assignments of error. The Ohio Court of Appeals affirmed the trial court on twelve grounds but reversed the conviction on the remaining error concerning the composition of the state grand jury. The Ohio Supreme Court reversed the decision of the Ohio Court of Appeals and reinstated the conviction. 69 Ohio St.2d 136, 431 N.E.2d 987 (1982). Aldridge then filed a petition for a writ of certiorari with the United States Supreme Court which was denied. *Aldridge v. Ohio*, 459 U.S. 841, 103 S.Ct. 91, 74 L.Ed.2d 84 (1982).

Thereafter, Aldridge filed his § 2254 petition for a writ of habeas corpus. Following the district court's denial of his petition, petitioner Aldridge filed this appeal raising the following issues: (1) whether the use of his confession at trial violated his Fifth and Sixth Amendment rights; (2) whether his Fifth and Fourteenth Amendment rights were violated when he was required to answer potentially incriminating questions on cross-examination; (3) whether his Fourteenth Amendment due process right was violated when, pursuant to Ohio law, the trial court placed the burden of establishing the affirmative defense of insanity on him; (4) whether his Sixth Amendment rights to a fair trial and impartial jury were violated because of the trial court's refusal to grant a change of venue; and (5) whether his Fifth, Sixth and Fourteenth Amendment rights were violated when doctors, lawyers, clergy, the elderly, the sick, dentists, college students, and felons were excluded from the grand jury.

## II.

### A.

Citing *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), petitioner argues that his Fifth and Sixth Amendment rights were violated by the use of his confession at trial. It is, of

---

**1.** The incident being investigated by the Pennsylvania authorities also involved the robbery of

a young woman at her home by a man wielding a knife.

course, fundamental that a criminal suspect can waive these rights "provided the waiver is made voluntarily, knowingly and intelligently." *Miranda,* 384 U.S. at 444, 86 S.Ct. at 1612. However, petitioner argues no such waiver occurred. This argument is based on the allegation that he was "denied food, sleep and the assistance of counsel." These same factual issues were considered by the state trial court and, as noted in the district court's opinion (adopting the magistrate's Recommendation and Findings), "[t]he [state trial] judge's seven page written opinion reviewed the evidence, took into consideration the totality of the evidence and applied the correct legal standards in reaching his conclusion to admit the oral confession into evidence." App. 16. *Cf. Clark v. Jago,* 676 F.2d 1099 (6th Cir.1982) (where the state court record was silent).

■ Once the district court has conducted an inquiry and determined that the state court "adequately resolved the factual issues contained in the petitioner's constitutional claim," *Fowler v. Jago,* 683 F.2d 983, 988 (6th Cir.1982), it is required to give the state court determinations a strong presumption of correctness. 28 U.S.C. § 2254(d). *See also Sumner v. Mata,* 449 U.S. 539, 101 S.Ct. 764, 66 L.Ed.2d 722 (1981) (*Sumner I* ); *Loveday v. Davis,* 697 F.2d 135 (6th Cir.1983). Although the "governing standard as to whether a plea of guilty is voluntary for purposes of the federal Constitution is a question of federal law, ... and not a question of fact subject to the requirements of 28 U.S.C. § 2254(d)," *Marshall v. Lonberger,* 459 U.S. 422, 431, 103 S.Ct. 843, 849, 74 L.Ed.2d 646 (1983) (citations omitted), the historical facts are governed by § 2254(d). *Id.* Thus, the state court's determination that the petitioner was capable of making a knowing and intentional waiver and was not denied food, sleep or the assistance of counsel is to be accorded "a high measure of deference...." *Sumner v. Mata,* 455 U.S. 591, 598, 102 S.Ct. 1303, 1307, 71 L.Ed.2d 480 (1982) (*Sumner II* ). Since the petitioner has failed "to establish by convincing evidence that the factual determi-

nation by the state court was erroneous," 28 U.S.C. § 2254(d), we accept these "historical facts." In applying the appropriate legal standards, we conclude that petitioner voluntarily, intelligently and knowingly relinquished both his right to remain silent and his right to counsel.

**B.**

■ Petitioner's second argument is also based on his Fifth Amendment privilege against self-incrimination and is based on the following sequence of events. At trial petitioner elected to take the witness stand and on direct examination, petitioner's attorney asked him a series of questions concerning his whereabouts on June 6, 7, and 8, 1979. Petitioner responded to each of the questions explaining at one point:

> [O]n June the 6th, I either was out fishing; I either was home; I could have been a dozen places. I have no set pattern. I get up in the morning about 10:00 o'clock. I eat lunch. I go to work. I come home, eat dinner, go to bed, get up, eat lunch. It's on and on. But that day I didn't go to work, I am pretty sure I didn't.

App. 499–500. On cross-examination petitioner was again questioned as to his whereabouts on June 6, 1979. After petitioner stated that he did not remember, the State's Attorney asked him specific questions regarding his involvement in a robbery of a young woman on that date. Although petitioner invoked the Fifth Amendment numerous times, the trial judge overruled each invocation and instructed him to answer.

The parties agree that by taking the stand petitioner waived his privilege against self-incrimination with respect to matters reasonably related to the subject matter of his examination. *Brown v. United States,* 356 U.S. 148, 154–55, 78 S.Ct. 622, 626, 2 L.Ed.2d 589 (1958). However, petitioner argues that the cross-examination went beyond the scope of direct and that direct examination had not opened the door. At oral argument, counsel for peti-

tioner stated that in order to have opened the door petitioner would have had to "directly said ... 'I was not in such and such a place at that time; I did not attack Miss Phillips or I did not attack Miss Blakeslee or Miss Eidens.'" We disagree.

As this court has stated, "[a]fter taking the stand, the defendant cannot proceed to answer those questions which reflect favorably upon his innocence and refuse to answer those questions which tend to indicate his guilt." *United States v. Doremus*, 414 F.2d 252, 253 (6th Cir.1969). This is especially true when, as here, the defendant's testimony focuses the court's attention on a time period when prior bad acts were alleged. As recently noted by the Supreme Court, "[o]nce a defendant decides to testify, '[t]he interest of the other party and regard for the function of courts of justice to ascertain the truth become relevant, and *prevail* in the balance of considerations determining scope and limits of the privilege against self-incrimination.'" *Jenkins v. Anderson*, 447 U.S. 231, 238, 100 S.Ct. 2124, 2129, 65 L.Ed.2d 86 (1980) (quoting from *Brown v. United States*, 356 U.S. 148, 156, 78 S.Ct. 622, 627, 2 L.Ed.2d 589 (1958)) (emphasis added).

In the present case not only is there a reasonable relationship between petitioner's testimony on direct and the cross-examination but there is a direct relationship. The state prosecutor's questions never strayed from the focus of the petitioner's statement. Accordingly, we hold that by testifying as he did on direct examination, petitioner's waiver of his right against self-incrimination extended, at least, to his conduct and whereabouts on June 6, 7, and 8, 1979.

**C.**

■ Petitioner's third argument is that the Ohio state law *requiring* him to prove the affirmative defense of insanity was violative of his Fourteenth Amendment right to due process of law. As both parties recognize, this court has held that " 'so long as a jury is instructed that the state has the burden of proving every element of the crime beyond a reasonable doubt, there is no due process violation' if the state places the affirmative defense of insanity upon the defendant." *Howze v. Marshall*, 716 F.2d 396, 398 (6th Cir.1983), *cert. denied*, —— U.S. ——, 104 S.Ct. 1015, 79 L.Ed.2d 245 (1984) (quoting *Krzeminski v. Perini*, 614 F.2d 121, 123 (6th Cir.1980), *cert. denied*, 449 U.S. 866, 101 S.Ct. 199, 66 L.Ed.2d 84). The petitioner, however, argues that *Howze* did not adequately consider several Supreme Court holdings and should now be reversed. We disagree, and since the jury in the petitioner's case was properly instructed, we hold that there was no due process violation.

**D.**

■ Petitioner argues, based on pre-trial publicity, that the state court's denial of a motion for change of venue violated his Sixth and Fourteenth Amendment rights to a fair trial and impartial jury. Petitioner concedes that the state court's holding on juror impartiality is subject to the statutory presumption of correctness. 28 U.S.C. § 2254(d); *Patton v. Yount*, —— U.S. ——, 104 S.Ct. 2885, 81 L.Ed.2d 847 (1984). Nevertheless, petitioner asserts that a review of the *voir dire* examination of the prospective jurors shows that the statutory presumption of correctness has been rebutted.

Petitioner's strongest argument is based on the fact that three of the jurors impaneled in petitioner's trial stated during *voir dire* that they had formed opinions on the issue of petitioner's guilt. Although all of the jurors in question also stated that they could set aside their opinions and render a verdict based on the evidence before the court, petitioner argues that they should not be believed. These determinations are particularly well-suited for the trial judge and, as the Supreme Court has long held, "[t]he mere existence of any pre-conceived notion as to the guilt or innocence of an accused, without more, is [insufficient] to rebut the presumption of a prospective juror's impartiality." *Irvin v. Dowd*, 366 U.S. 717, 722–23, 81 S.Ct. 1639, 1642, 6

68

L.Ed.2d 751 (1961) (citations omitted). Consequently, federal courts have intervened in state court convictions because of pre-trial publicity only in extraordinary cases. *See, e.g., Patton v. Yount,* — U.S. —, 104 S.Ct. 2885, 81 L.Ed.2d 847 (1984) (no reversal although publicity of confession and prior plea of insanity and although when questioned about the case in *voir dire* it was discovered that all but two (2) of one hundred sixty-three (163) veniremen had heard of it and seventy-seven per cent (77%) had an opinion which they would take into the jury box); *Sheppard v. Maxwell,* 384 U.S. 333, 86 S.Ct. 1507, 16 L.Ed.2d 600 (1966) (reversal where courthouse had "carnival atmosphere"); *Estes v. Texas,* 381 U.S. 532, 85 S.Ct. 1628, 14 L.Ed.2d 543 (1965) (reversal where a "circus atmosphere" pervaded the various hearings in the case); *Rideau v. Louisiana,* 373 U.S. 723, 83 S.Ct. 1417, 10 L.Ed.2d 663 (1963) (reversal where a twenty-minute confession was repeatedly broadcast on television); *Irvin v. Dowd,* 366 U.S. 717, 81 S.Ct. 1639, 6 L.Ed.2d 751 (1961) (reversal where reports of a line-up identification, the defendant taking a lie detector test, confessions and a plea bargain were all publicized). *See also Brofford v. Marshall,* 751 F.2d 845 (6th Cir.1984).

From our review of the record, we note that there was considerable publicity concerning the murder in question. However, publicity of this type almost inevitably surrounds crimes of this nature in small communities, and we hold that it was not so prejudicial as to deny petitioner a fair trial.

### E.

 Petitioner's final argument is that his Fifth, Sixth and Fourteenth Amendment rights were violated when doctors, lawyers, clergy, the elderly, the sick, dentists, college students and felons were excluded by one of the jury commissioners from the *grand jury.* At the outset we note that cases challenging the makeup of state grand juries are analyzed under the equal protection clause of the Fourteenth Amendment, *Castaneda v. Partida,* 430 U.S. 482, 97 S.Ct. 1272, 51 L.Ed.2d 498 (1977); *see also Rose v. Mitchell,* 443 U.S. 545, 99 S.Ct. 2993, 61 L.Ed.2d 739 (1979), while the right to a representative state petit jury is protected under the Sixth Amendment fair cross-section requirement. *See Taylor v. Louisiana,* 419 U.S. 522, 95 S.Ct. 692, 42 L.Ed.2d 690 (1975). The basis for this distinction results from the now well-settled constitutional holding that the Fifth Amendment right to a grand jury does not apply to state prosecutions, *Hurtado v. California,* 110 U.S. 516, 4 S.Ct. 111, 28 L.Ed. 232 (1884), although the Sixth Amendment right to a petit jury made up of a fair cross-section of the community, of course, does apply to state prosecutions. *See Taylor,* 419 U.S. 522, 95 S.Ct. 692, 42 L.Ed.2d 690 (1975).

Although there is no right to be indicted by a state grand jury, "if a state chooses to use grand juries, the jurors must be selected without discrimination because of race or color." *Mitchell v. Rose,* 570 F.2d 129, 133 (6th Cir.1978), *rev'd on other grounds,* 443 U.S. 545, 99 S.Ct. 2993, 61 L.Ed.2d 739 (1979). In *Castaneda v. Partida,* the Supreme Court stated the test as:

[i]n order to show that an equal protection violation has occurred in the context of grand jury selection, the defendant *must show* that the procedure employed resulted in substantial underrepresentation of his race or the identifiable group *to which he belongs.* The first step is to establish that the group is one that is a recognizable, distinct class, singled out for different treatment under the laws, as written or as applied.... Next, the degree of underrepresentation must be proved by comparing the proportion of the group in the total population to the proportion called to serve as grand jurors, over a significant period of time.... Finally, ... a selection procedure that is susceptible of abuse or is not racially neutral supports the presumption of discrimination raised by the statistical showing.... Once the defendant has shown substantial underrepresentation of *his group,* he has made a prima facie case of discriminatory purpose and the

burden then shifts to the state to rebut the case.

430 U.S. at 494–95, 97 S.Ct. at 1280 (emphasis supplied).

In the instant case, we need go no further than the first sentence of the Supreme Court's holding. The Court stated that the petitioner *must* show underrepresentation of the identifiable group *to which he belongs*. The petitioner has not claimed to be a doctor, lawyer, student, clergy, dentist, sick, or a felon. Consequently, his Fourteenth Amendment equal protection rights were not violated.

### III.

The judgment of the district court dismissing the petition for habeas corpus is AFFIRMED.