**Michael Earl YOUNG, Petitioner,**

v.

**Gerald HOFBAUER, Respondent.**

**No. 99–70389.**

United States District Court,
E.D. Michigan,
Southern Division.

April 26, 2001.

Rolf E. Berg, State Appellate Defenders Office, Detroit, MI, for Petitioner.

Janet Van Cleve, MI Dept. of Atty. Gens. Office, Lansing, MI, for Respondent.

### OPINION AND ORDER GRANTING PETITION FOR WRIT OF HABEAS CORPUS [1]

TARNOW, District Judge.

## I. *Introduction*

Petitioner Michael Earl Young is currently incarcerated at the Marquette Branch Prison in Marquette, Michigan. He has filed a petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254, alleging that he is incarcerated in violation of his constitutional rights. For the reasons

1. Staff Attorney Mary Beth Collery provided quality research assistance.

set forth below, the Court grants the petition.

## II. *Facts*

Petitioner's conviction arises out of the shooting death of Marvelle Toney (also referred to in the trial transcripts and state court pleadings as Marvelle Carthan) on May 27, 1990. Late in the evening on May 26, 1990, Petitioner's aunt, Rosie Lee Miller, and her two friends, Martha Calbert and Jennifer Clemmons, drove to the Soul Survivors Club in Saginaw, Michigan. Before they entered the club, a few men tried to talk to them. Miller told the men that they were too young for her, which incited the men to shout obscenities at her and her friends. Miller got a crowbar and began swinging it at the men. She and Mr. Toney shouted angry words to each other. Miller and her friends then left the club parking lot and went to Martha Calbert's home.

Jennifer Clemmons and Barbara Barns testified that once they arrived at Martha Calbert's home, Miller got a gun and stated that she was going to kill Marvelle Toney. Miller's nephew, Petitioner Michael Earl Young, said that Miller should let him kill Marvelle Toney. Petitioner got a gun and put it in the trunk of Miller's car. Petitioner, Miller, Calbert, Clemmons, and Barns then drove to the Soul Survivors Club, along the way planning how they would lure Mr. Toney out of the club so that Petitioner could shoot him. When they arrived at the club, Calbert lured Mr. Toney outside where Petitioner shot him twice. Mr. Toney died of his wounds.

Petitioner was tried with co-defendants Miller and Calbert. Miller testified at trial that she could not recall what she had been doing the night of May 26, 1990. She further testified that she had never been to the Soul Survivors Club and that she did not know the victim. Neither Petitioner nor codefendant Calbert testified in their own defense.

## III. *Procedural History*

Petitioner was arraigned on first-degree murder charges in December 1993 for the 1990 murder of Marvelle Toney, which is the subject of the pending petition. At the time of this arraignment, he was in prison for receiving and concealing stolen property. On December 31, 1993, he was mistakenly released on parole and a massive manhunt ensued. Three days later a female clerk at a 7–Eleven store in Saginaw, Michigan, was murdered and Petitioner was implicated. Petitioner was undergoing the preliminary examination for the charges arising from the 7–Eleven killing when his trial for the 1990 murder was about to begin and, as a result, was the subject of television and newspaper coverage.

Petitioner's attorney moved for a change of venue in light of the pretrial publicity relating to the 7–Eleven killing. The trial court denied the motion.

Following a jury trial in Saginaw County Circuit Court, Petitioner was convicted of first-degree murder, carrying a dangerous weapon with unlawful intent, and felony firearm. On May 4, 1994, he was sentenced to life imprisonment for the first-degree murder conviction, three to five years imprisonment for the carrying a dangerous weapon conviction, and two years imprisonment for the felony-firearm conviction, to be served consecutively.

Petitioner filed an appeal of right in the Michigan Court of Appeals, in which he claimed: (1) that the trial court abused it discretion when it denied his motion for a change of venue in light of pretrial publicity relating to the 7–Eleven killing; (2) that the trial court erred in refusing to excuse

several jurors for cause on the basis of their exposure to this pretrial publicity; (3) that the trial court abused its discretion in denying his motion for additional peremptory challenges; (4) that the *voir dire* violated M.C.R. 2.511(F); and (5) that the prosecutor's closing argument denied him a fair trial by referring to the 7–Eleven murders.

The Michigan Court of Appeals affirmed Petitioner's conviction. *People v. Young,* No. 176222 (Mich. Ct.App. April 8, 1997). Petitioner next filed an application for leave to appeal to the Michigan Supreme Court, which was denied. *People v. Young,* 456 Mich. 930, 573 N.W.2d 625 (Mich.1998).

Petitioner then filed a petition for a writ of habeas corpus in this Court, presenting the following claim:

    I.  Mr. Young was denied his federal constitutional right to a fair jury trial by the failure of the trial court to grant a change of venue or strike jurors who had learned of exceptionally prejudicial, inadmissible evidence in the massive pretrial publicity.

## IV. *Standard of Review*

The Antiterrorism and Effective Death Penalty Act of 1996, Pub.L. No. 104–132, 110 Stat. 1214 ("AEDPA") altered the standard of review federal courts must apply when reviewing applications for a writ of habeas corpus. The AEDPA applies to all habeas petitions filed after the effective date of the act, April 24, 1996. Because petitioner's application was filed after April 24, 1996, the provisions of the AEDPA, including the amended standard of review, apply to this case.

**2.** 28 U.S.C. § 2254(e)(1) provides, in pertinent part:

    In a proceeding instituted by an application for a writ of habeas corpus by a person in

■ As amended, 28 U.S.C. § 2254(d) imposes the following standard of review that a federal court must utilize when reviewing applications for a writ of habeas corpus:

An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim—

(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

(2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceedings.

28 U.S.C. § 2254(d). Therefore, federal courts are bound by a state court's adjudication of a petitioner's claims unless the state court's decision was contrary to or involved an unreasonable application of clearly established federal law. *Franklin v. Francis,* 144 F.3d 429 (6th Cir.1998). Additionally, this Court affords state court factual determinations a presumption of correctness. 28 U.S.C. § 2254(e)(1)[2]; *see also Cremeans v. Chapleau,* 62 F.3d 167, 169 (6th Cir.1995) ("We give complete deference to state court findings unless they are clearly erroneous").

■ The United States Supreme Court has explained the proper application of the "contrary to" clause as follows:

custody pursuant to the judgment of a State court, a determination of a factual issue made by a State court shall be presumed to be correct.

A state-court decision will certainly be contrary to [the Supreme Court's] clearly established precedent if the state court applies a rule that contradicts the governing law set forth in our cases. . . .

A state-court decision will also be contrary to this Court's clearly established precedent if the state court confronts a set of facts that are materially indistinguishable from a decision of this Court and nevertheless arrives at a result different from [the Court's] precedent.

*Williams v. Taylor*, 529 U.S. 362, 120 S.Ct. 1495, 1519–20, 146 L.Ed.2d 389 (2000).

■ With respect to the "unreasonable application" clause of § 2254(d)(1), the United States Supreme Court held that a federal court should analyze a claim for habeas corpus relief under the "unreasonable application" clause when "a state-court decision unreasonably applies the law of this Court to the facts of a prisoner's case." *Id.*, 120 S.Ct. at 1521. The Court defined "unreasonable application" as follows:

[A] federal habeas court making the "unreasonable application" inquiry should ask whether the state court's application of clearly established federal law was objectively unreasonable. . .

[A]n unreasonable application of federal law is different from an incorrect application of federal law. . . . Under § 2254(d)(1)'s "unreasonable application" clause, then, a federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly.

Rather, that application must also be unreasonable. ·

*Id.*, 120 S.Ct. at 1521–22.

With this standard in mind, the Court proceeds to the merits of the petition for a writ of habeas corpus.

## V. *Analysis*

Petitioner claims that he is entitled to habeas corpus relief because he was denied his constitutional right to be tried by an impartial jury. In the brief in support of his habeas corpus petition, Petitioner appears to assert a two-fold claim for habeas corpus relief: first, that the trial court erred in denying the motion for a change of venue because prejudice should be presumed based on extensive pretrial publicity; and second, that he was denied an impartial jury because the trial court denied his challenges for cause of certain jurors. During oral argument regarding the petition, however, counsel for Petitioner stated that Petitioner's claim for habeas corpus relief is based on actual prejudice alone and not presumed prejudice. Thus, this Court will consider the petition with respect to Petitioner's claim of actual prejudice.

Petitioner apparently was the subject of a fair amount of publicity preceding his trial. As discussed above, this publicity was not related to the crime for which Petitioner was on trial and which he is now challenging in this habeas corpus proceeding. Instead, the publicity related to Petitioner's accidental release from jail and subsequent alleged commission of the robbery and murder of an employee at a 7–Eleven in Saginaw, Michigan. Although Petitioner only presented two partial newspaper articles as evidence of this pretrial publicity which, by themselves, do not establish extensive pretrial publicity[3], the

---

**3.** The first article, appearing in the *Saginaw News* on January 23, 1994, bore the following headline: "Iron bars separate kin; Relatives trace years of run-ins with the law." That article focused on Petitioner's family's repeated legal troubles, stating that seven of

trial court proceeded in a manner which would indicate that pretrial publicity was of sufficient concern to require extensive *voir dire* regarding potential jurors' familiarity with the 7–Eleven murder.

Petitioner claims that the *voir dire* examinations of three jurors, Randy Gifford, Helen McClung, and Patricia Mueller, revealed that these jurors would be unable to decide his case impartially because they could not set aside their knowledge of Petitioner's alleged involvement in the 7–Eleven murder. Petitioner challenged these jurors for cause, but the trial court judge denied these challenges. Petitioner argues that the presence of these jurors violated his right to an impartial jury.

■ Where the partiality of a particular juror is at issue, the relevant question is "did a juror swear that he could set aside any opinion he might hold and decide the case on the evidence, and should the juror's protestations of impartiality have been believed." *Patton v. Yount,* 467 U.S. 1025, 1036, 104 S.Ct. 2885, 81 L.Ed.2d 847 (1984). On habeas corpus review, a federal court considering whether a trial court has seated a fair and impartial jury must determine "whether there is fair support in the record for the state courts' conclusion that the jurors ... would be impartial." *Id.* at 1038, 104 S.Ct. 2885. The United States Supreme Court and the Sixth Circuit Court of Appeals have enumerated various factors to be considered in determining whether a fair and impartial jury has been assembled, including: "the nature of the information the juror knew; how probative the information was as to a defendant's guilt; when and how

they learned of that information; the juror's own estimation of the relevance of that knowledge; any express indications of partiality by a juror; whether the broader atmosphere in the community or courtroom was sufficiently inflammatory; and the steps taken by the trial court in neutralizing this information." *Gall v. Parker,* 231 F.3d 265, 308 (6th Cir.2000), *citing Murphy v. Florida,* 421 U.S. 794, 800, 95 S.Ct. 2031, 44 L.Ed.2d 589 (1975).

■ A juror's familiarity with a case does not necessarily disqualify that juror:

It is not required, however, that the jurors be totally ignorant of the facts and issues involved. In these days of swift, widespread and diverse methods of communication, an important case can be expected to arouse the interest of the public in the vicinity, and scarcely any of those best qualified to serve as jurors will not have formed some impression or opinion as to the merits of the case. This is particularly true in criminal cases. To hold that the mere existence of any preconceived notion as to the guilt or innocence of an accused, without more, is sufficient to rebut the presumption of a prospective juror's impartiality would be to establish an impossible standard. It is sufficient if the juror can lay aside his impression or opinion and render a verdict based on the evidence presented in court.

*Irvin,* 366 U.S. at 722–23, 81 S.Ct. 1639.

■ At the same time, the Supreme Court also has cautioned that a "juror's assurances that he is equal to the task cannot be dispositive of the accused's rights and it remains open to the defen-

---

Petitioner's relatives were in prison, three on murder charges. It also included, in bold, blocked text, this statement from Petitioner's mother's regarding the 7–Eleven murder: "I don't think he did it. Witnesses out there can give an alibi of where he was. They picked

him up because he has a record." The second *Saginaw News* article, appearing on February 4, 1994, had the following headline regarding the 7–Eleven murder: " 'We went out, and Bo killed a lady', witness says." "Bo" was one of Petitioner's nicknames.

dant to demonstrate 'the actual existence of such an opinion in the mind of the juror as will raise the presumption of partiality.' " *Murphy,* 421 U.S. at 800, 95 S.Ct. 2031, *quoting Irvin* 366 U.S. at 723, 81 S.Ct. 1639.

█ Further, a trial court's determination of questions of juror credibility is entitled to "special deference." *Patton,* 467 U.S. at 1038, 104 S.Ct. 2885. Where a prospective juror, subjected to extensive *voir dire,* has given ambiguous and at times contradictory answers, the trial judge is in the best position to render a judgment as to which of those ambiguous or contradictory statements are "the most fully articulated or ... appear[ ] to have been least influenced by leading." *Id.* at 1039, 104 S.Ct. 2885. "[O]nly the trial judge [can] tell which of [the apparently contradictory] answers was said with the greatest comprehension and certainty." *Id.* at 1040, 104 S.Ct. 2885.

█ In the instant case, Petitioner challenged three jurors for cause. The Court will first address the *voir dire* examination of Randy Gifford.

During *voir dire,* Mr. Gifford stated that he was familiar with the 7–Eleven murder. He testified that the 7–Eleven was owned by the in-laws of a man with whom he car pooled, Bill Blake, and that he and Mr. Blake discussed the 7–Eleven murder a couple of times on the drive into work. He also testified that he had seen some television coverage of the murder. When asked by Petitioner's counsel whether what he knew about the 7–Eleven killing might filter into his decision-making process in this case, Mr. Gifford replied, "Consciously I don't think so; subconsciously, it might bring my mind back on to that." He stated he would like to think it would not factor into his decision-making process, but stated, "it's possible [it would], yes."

After examination by counsel for the defendants, the prosecutor asked Mr. Gifford additional questions regarding his ability to be impartial:

Q: ... Mr. Sturtz here asked you whether or not—and I think you answered subconsciously, it may or may not play—would you make a concerted effort in this case just to base your decision solely on the facts presented here in court, could you do that?

A: Yes.

Q: And if, during the course of jury deliberations, some other prospective juror in the jury room said oh, I read this or I know of this, and bring it out, could you then tell everybody, look, we're here to decide this case only on the facts here; could you do that?

A: Yes.

In denying defense counsel's challenge of Randy Gifford for cause, the trial judge stated, in pertinent part:

... I listened closely to him, because different jurors have nuances, and manners of [speech]. Some people say unequivocally yes, no; others say I think I can, I'll do my best, I believe I can do it. And I have to take that in the context of the juror's mannerisms and figures of speech.

I listened very closely to Mr. Gifford. I'm confident that he could set aside the information he's received from Mr. Blake and the media, which is of a rather limited nature, and decide this case fairly, justly and impartially. So I'll deny the challenge.

While this Court recognizes and accords deference to the state court's determination of credibility and demeanor, in this case, the Court cannot ignore the plain words of the transcript. Mr. Gifford repeatedly expressed doubt about his ability to be fair and impartial. He admitted that

his knowledge about the 7–Eleven murder might impact his decision-making process. Although Mr. Gifford later answered affirmatively when asked whether he could *try* to base his decision only on the facts presented at trial, this affirmative response to the prosecutor's leading question did not mitigate or diminish his earlier statements that this knowledge might infiltrate his evaluation of the evidence presented in this case.

The trial judge stated that he was "confident" that Mr. Gifford could set aside his knowledge of the 7–Eleven killing. The trial court judge made this finding in the face of Mr. Gifford's plain statements that he was *not* confident that he could set his knowledge aside. Given that the trial court judge failed to explore further Mr. Gifford's statements that he did not know if he would be able to base his decision only on the facts admitted in this case, the trial judge had no basis for discounting Mr. Gifford's testimony to the contrary and vesting confidence in a juror who admitted to having no such confidence in himself.

The Sixth Circuit Court of Appeals has held that "[a] court's refusal to excuse a juror will not be upheld 'simply because the court ultimately elicits from the prospective juror a promise that he will be fair and impartial ...' " *Wolfe v. Brigano*, 232 F.3d 499, 502 (6th Cir.2000), *quoting Kirk v. Raymark Industries, Inc.*, 61 F.3d 147, 156 (3rd Cir.1995). In *Wolfe*, the trial court denied the defense's challenges for cause of four prospective jurors for a murder trial. The first two prospective jurors were close friends of the victim's parents. One of those jurors did not think he could be a fair and impartial juror, another conceded that it was " 'hard to say' " whether her relationship with the parents would influence her. *Id.* The third challenged juror had read and seen news accounts of

the crime and "expressed doubt as to whether she could put aside those reports and decide the case solely on the evidence presented at trial." *Id.* at 502–03. The fourth "doubted he would require the prosecution to prove its case beyond a reasonable doubt." *Id.* at 503.

The Sixth Circuit Court of Appeals affirmed the district court's decision granting habeas corpus relief based on the trial court's failure to excuse these challenged jurors, stating, in pertinent part:

> In the absence of an affirmative and believable statement that these jurors could set aside their opinions and decide the case on the evidence and in accordance with the law, the failure to dismiss them was unreasonable. *See Patton*, 467 U.S. at 1036, 104 S.Ct. 2885.
>
> From the record before us, it appears that the trial judge based his finding of impartiality upon each juror's tentative statements that they would try to decide this case on the evidence presented at trial. Such statements, without more, are insufficient.... The Sixth Amendment guarantees [petitioner] the right to a jury that will hear his case impartially, not one that tentatively promises to try.

*Id.*

Just as the challenged jurors in *Wolfe* failed to affirmatively assert their ability to set aside their opinions and decide the case on the evidence presented at trial, Mr. Gifford did not affirmatively express an ability to set aside his opinions. He agreed that he would try to do so, but simultaneously expressed doubt about his ability to do so. While a potential juror's willingness to *try* to set aside bias is commendable, it is, by itself, insufficient to overcome the same juror's express concern that he would not be able to set aside that bias. Such juror equivocation bearing upon the fundamental right to impartiality fails to satisfy the Sixth Amendment right

an impartial jury. *See Wolfe* 232 F.3d at 503.

This Court concludes that the state court's finding that Mr. Gifford would be impartial was clearly erroneous. Therefore, the trial court's refusal to dismiss Mr. Gifford for cause was unreasonable. In so holding, this Court is not infringing upon the trial court's superior position to resolve ambiguous statements based upon a prospective juror's demeanor. In this instance, the trial court did not discredit Mr. Gifford's expressions of doubt regarding his impartiality in favor of more credible statements that he could be impartial. Instead, the trial court judge discredited Mr. Gifford's doubts regarding his ability to be impartial in the absence of any statements affirmatively asserting Mr. Gifford's ability to be impartial. The standards governing a federal court's habeas review of state court decisions do not require this Court to ignore such an erroneous conclusion by the trial court judge simply because the trial court observed Mr. Gifford's demeanor and this Court did not.

■ Petitioner also challenges the trial court's refusal to excuse jurors Helen McClung and Patricia Mueller for cause. First, Helen McClung testified that she had vague recollections of a newspaper article which appeared approximately two months prior to the trial in which Petitioner's family's history of crime was discussed. She also had some familiarity with the charges against Petitioner in the 7–Eleven murder. She repeatedly testified, however, that she would be able to set all of that information aside in determining Petitioner's guilt or innocence in the instant case. When asked how she could set all that aside, she replied, "You've just got to."

■ Second, Patricia Mueller, a cosmetologist, testified that some of the women who came into the shop where she worked knew the victim of the 7–Eleven murder, but Ms. Mueller did not know the victim. Ms. Mueller read the article in the *Saginaw News* about Petitioner's family's connection with crime. When asked whether the article left her with the impression that Petitioner's family situation was a positive or negative one, she answered, "Probably a negative." But she further testified that she could separate what she read in the paper and heard at work from what she heard at trial and that she would not require Petitioner to present any evidence to overcome any negative impressions. When asked how she could set aside what she had heard and read and base her decision only on what was presented at trial, she stated, "Because I haven't heard the other side. I've heard what was in the paper, but I haven't heard the other side."

While both Ms. McClung and Ms. Mueller expressed some familiarity with Petitioner's and his family's criminal past, neither stated that they had any pre-conceived opinions as to his guilt or innocence. In addition, in contrast to Mr. Gifford, both also affirmatively expressed an ability to set aside anything they learned outside the courtroom in reaching a verdict. Considering all of these factors, the Court concludes that the record fairly supports the trial court's decision that Ms. McClung and Ms. Mueller were impartial.

## VI. *Conclusion*

For the foregoing reasons, **IT IS ORDERED** that a writ of habeas corpus is **GRANTED.** Unless a date for a new trial is scheduled within ninety days, Petitioner Young must be unconditionally released at that time.