IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON
Assigned on Briefs July 8, 2020

## SHAWN GIBSON DELOSH v. STATE OF TENNESSEE

**Appeal from the Circuit Court for Dyer County**
**No. 16-CR-324      R. Lee Moore, Jr., Judge**
_____

### No. W2019-01760-CCA-R3-PC
_____

The petitioner, Shawn Gibson Delosh, appeals the denial of his post-conviction petition arguing the post-conviction court erred in finding he received effective assistance of counsel at trial and on appeal. Following our review, we affirm the post-conviction court's denial of the petition.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed**

J. ROSS DYER, J., delivered the opinion of the court, in which JOHN EVERETT WILLIAMS, P.J., and ROBERT W. WEDEMEYER, J., joined.

Matthew A. Burns, Dyersburg, Tennessee, for the appellant, Shawn Gibson Delosh.

Herbert H. Slatery III, Attorney General and Reporter; T. Austin Watkins, Assistant Attorney General; Danny Goodman, Jr., District Attorney General; and Karen Burns, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

### *Factual and Procedural History*

I.   *Trial Proceedings*

The petitioner, Shawn Gibson Delosh, was convicted by a Dyer County jury of promoting the manufacture of methamphetamine, *see* Tennessee Code Annotated section 39-17-433(a)(1), for which he received a sentence of twelve years, to be served consecutively to his prior sentences and parole revocations. On direct appeal, this Court set forth the relevant facts as follows:

On September 26, 2016, Tim McCraw was contacted regarding rental property located at 86 Parker Road, Dyersburg, Tennessee (the property), which was leased to Beth McDonald and the [petitioner]. He testified that they had lived at the property since May 2016, and that no other adults lived at the home. McCraw identified several photographs of his property at trial, which were shown to the jury and admitted as exhibits. He confirmed that there had been a large party on the property at some point, which the sheriff's department "shut down." Tamika Holman also testified and assisted deputies during the search of the property. She found "aluminum foil with residue of used . . . meth" inside a garbage can in a bedroom. She also found a "shake bottle" near "a pile beside the shed" in the back yard.

Investigator Stoney Hughes of the Dyer County Sheriff's Office testified that he had specialized training in the area of clandestine meth labs or "homemade meth labs." He assisted in the search of the property and arrived "[j]ust before 11 [a.m.]." The [petitioner] and his girlfriend were in the bedroom, and it "took several minutes to get someone to come to the door." Investigator Hughes found "aluminum foil that had burn marks on it, as well as a plastic bag corner," both of which were indicative of meth use. Photographs of the items and where they were found were shown to the jury and admitted into evidence. Investigator Hughes said that the [petitioner] admitted that the paraphernalia found inside the house belonged to him, that he was a meth user, and that "he buys his dope."

Investigator Hughes also searched the outside of the residence and explained that:

> Through my experience, when someone is cooking meth, it's difficult to discard the remnants of a shake lab or the gas generator. Pretty much the only way to get rid of the evidence is to attempt to burn it. It's very common and one of the things that we do is look for what we call burn piles. We see if we can locate where they've been cooking meth.

He testified that there was a "burn pile" at the southern end of the property, and that many of the components necessary for the production of methamphetamine had been destroyed in it. He found a "Dr. Pepper bottle" in the yard between the shed and the house, which he identified as a gas generator. Investigator Hughes further explained the significance of the hole in the top of the bottle as follows:

They'll stick a tubing into the hole and shake the bottle and the acid as it mixes the sulfuric acid, as it mixes with the salt will create the hydrochloric gas and it will go through the tubing and then it'll go down. Whatever container they have the liquid in to turn it back into a salt. It's called gassing it off.

He confirmed residue from the hydrochloric acid remained inside the bottle. The bottle was found l[]ying in leaves with nothing on top of it. He also identified several cans of camp fuel and paint thinner, both flammable liquids commonly used as a solvent for shake labs, found on the property. No other camping material such as lanterns or gas stoves used for legitimate purposes were found. The jury was shown a photograph upon which Investigator Hughes identified where the items were found in the backyard of the property.

Investigator Hughes opined that the items recovered from the backyard of the property had not been there for very long because the camping fuel can had no dirt on it. He said that the meth lab was "a couple of weeks [old] at most" because the bottle still had white residue inside and the outside was clean. A video showing Investigator Hughes "neutralize" the shake bottle meth lab was also played for the jury and admitted into evidence. Asked if there was anything in the backyard area of the property to indicate that the residents would use that area, Investigator Hughes said there were toys, a swing set, and a trampoline that had been closer to the house. He estimated the cost of "a ball" or a gram of methamphetamine was $50 or $75. He confirmed that Investigator Ricky Gregory found the cans of camp fuel and paint thinner. He further agreed that certain components necessary to produce methamphetamine were not found on the property including "pseudophed pills," blister packs, and lithium batteries. However, ammonium nitrate and sodium hydroxide were presumed to be within the sludge. He confirmed that the [petitioner] admitted he was a meth user; however, he denied any knowledge of the items found outside the house.

Chief Glen Cook with the Dyer County Sheriff's Department was present during the search of the property and was responsible for securing the property and moving all individuals to the front living room area of the house. He said the [petitioner], Beth McDonald, three girls, and a juvenile boy were present at the time of the search. He observed the [petitioner] to be "nervous," "agitated," and "under the influence." He took a video recording with his phone showing Investigator Hughes neutralize the shake lab. While

he recorded the process, he observed a "sort of reaction" because it was "bubbling or fizzing."

Investigator Rick Gregory of the Dyer County Sheriff's Department testified that he was experienced in investigating clandestine meth labs and that he was present during the search of the property. While searching the perimeter of the property, he observed several items related to the manufacture of methamphetamine including a Dr. Pepper bottle and confirmed that it was a gas generator. He further observed two empty cans of Coleman type stove fluid, which he found l[]ying in the bushes. He also found paint thinner within "a 10 or 12 foot radius" of the camp fluid. He said these items were found "35 to 40 feet" from the house.

The Defense recalled Tim McCraw, who clarified that there were two sheds on his rental property. He explained two photographs of the sheds that were taken from different angles. Tracy Jones, an investigator for the [petitioner], testified that he had taken the photographs of the sheds on the property a few days prior to trial. He said some of the photographs showed garbage that was behind "a little creek bank or something." Danny Fowlkes, the Dyer County Register of Deeds, testified that the last time a house was registered with his office as quarantined was in 2014.

At the time of the search, Beth McDonald had lived at the property with the [petitioner], her three children and her oldest daughter, Aliegha Landers, and her boyfriend, Shawn Phillips. She testified that they had lived there since April. Although she was aware that the [petitioner] had used methamphetamine in the past, she had not observed any illegal activity on the property. She confirmed that a large party occurred on the property "towards the end of June," with three or four hundred guests. She identified photographs that were admitted into evidence showing (1) a party and a bonfire; (2) her daughter and her boyfriend from the night of the party; (3) guests at the party using fire batons; and (4) set up for the party and DJ equipment. She said they had "several" bonfires at the party and used camping fuel and gasoline to ignite them. Shawn Phillips and Aliegha Landers testified consistently with the testimony of Beth McDonald. Aliegha Landers also testified that she had never witnessed "any cooking of methamphetamine by anyone" while they lived at the property. She said the party occurred in June 2016, approximately three months before the search of the property.

At the beginning of the [petitioner's] testimony, he was shown the photograph of the Dr. Pepper bottle and explained that he had never seen it. He confirmed that the party occurred on the property in June and that camping fuel and other "facilitants" were used to start the bonfire. He denied any knowledge of "meth sludge" as described by Investigator Hughes. Asked "You have heard the people testify that you have used methamphetamine?" The [petitioner] replied, "Yes. I don't . . . I don't know, you know, that I have used it." He confirmed that he told the police that he "bought [his] dope," and explained he did so because it was cheaper than making it. He said he was purchasing meth for $30 a gram rather than buying the ingredients, which cost over $100. He denied cooking methamphetamine. According to the [petitioner], before finding anything on the property, Investigator Hughes told the [petitioner] that he "put [the petitioner] in prison last time, [and] he was going to put [the petitioner] in prison this time too." On cross-examination, the [petitioner] agreed that he had been addicted to methamphetamine for almost fifteen years. He further agreed that upkeep of the property was his responsibility and that his brother was paid to mow the lawn.

Investigator Hughes was recalled and testified that both sheds on the property were searched, no meth components were found, and nothing from those structures was recovered at the time of the search. He further explained that houses are registered to be quarantined only when there is an active meth lab found inside the house. Because the entirety of this meth lab was found outside the house, it was not quarantined. He stated the grass underneath the Dr. Pepper bottle was still alive when it was recovered, which indicated that the meth lab was "very recent" or "no more than a couple of weeks." Investigator Hughes did not recall making the statements attributed to him by the [petitioner] at the time of the search.

*State v. Shawn Gibson Delosh*, No. W2018-00272-CCA-R3-CD, 2019 WL 920358, at *1-3 (Tenn. Crim. App. Feb. 22, 2019).

This Court affirmed the trial court's judgment and twelve-year sentence.

  II.   *Post-Conviction Proceedings*

Following the denial of his direct appeal, the petitioner filed a timely pro se petition for post-conviction relief. After the appointment of counsel, the petitioner filed an amended petition, arguing trial counsel was ineffective for failing to: adequately meet with

the petitioner and prepare the petitioner to testify at trial; secure a favorable plea deal; challenge the basis of the parole search of the petitioner's property; interview potential witnesses; identify an alternative source for the evidence of methamphetamine manufacturing found on the petitioner's property; retain a forensic expert; strike a biased juror; challenge the State's physical evidence at trial; object to unqualified expert testimony; and object to the State's use of impeachment evidence during cross-examination of the petitioner. Both trial counsel and the petitioner testified at the post-conviction hearing.

Trial counsel testified that he represented the petitioner at trial, at the motion for new trial, and on appeal. In preparing for trial, trial counsel met with the petitioner "a couple of different times" and met with the petitioner in prison "at least once." He felt as if he discussed trial matters with the petitioner adequately. Trial counsel admitted he spent a small amount of time preparing the petitioner to testify because the petitioner was incarcerated during trial preparation.

Trial counsel also met with the State multiple times to negotiate a plea deal for the petitioner. The State first offered the petitioner eight years; however, trial counsel negotiated the offer down to four years. He took the four-year offer to the petitioner, but the petitioner turned it down because he wanted to go to trial. Because the petitioner was a career offender, trial counsel advised the petitioner to take the offer.

In addition to the plea negotiations, trial counsel prepared for trial by going to the crime scene "on multiple occasions" with an investigator, taking photographs of the scene, and developing an understanding of the layout of the petitioner's property. Trial counsel spoke with the petitioner's girlfriend, Beth McDonald, Ms. McDonald's oldest daughter, Aliegha Landers, and Ms. Landers's boyfriend, Shawn Phillips, who all lived on the petitioner's property and attended the bonfire party held on the property three weeks before the search. Trial counsel did not interview any other witnesses from the bonfire party because the petitioner did not ask him to nor did the petitioner provide him with a list of people to interview. Trial counsel explained that, had the petitioner provided him with a list of potential witnesses, he would have followed up with the individuals.

Trial counsel explained that the case began after law enforcement conducted a search of the petitioner's property. He did not object to probable cause related to the search nor did he attempt to suppress the evidence obtained during the search because suspicionless searches were a condition of the petitioner's parole. He did not challenge the basis of the search further because "the case law . . . for parole searches at the time. . . worked against the defense."

During the search, law enforcement officers took pictures of the methamphetamine paraphernalia and the burn piles located on the petitioner's property. After documenting the scene, law enforcement destroyed the physical evidence due to its toxic and hazardous nature. Trial counsel explained that he worked methamphetamine cases in the past and knew it was common practice for law enforcement to destroy methamphetamine labs and methamphetamine paraphernalia in order to neutralize the danger caused by the drug. For this reason, trial counsel did not obtain an expert to testify about the drug or physical evidence found on the petitioner's property, nor did he file a motion regarding the loss or destruction of physical evidence. He also chose not to make a chain of custody challenge because the officers who took the photographs testified at trial and authenticated the evidence. Instead, trial counsel chose to use the photographs to show many materials necessary to manufacture methamphetamine were not on the petitioner's property at the time of the search.

When questioned about jury selection, trial counsel was unable to recall whether one of the jurors stated they attended the same gym as the prosecutor. However, trial counsel admitted that if there was a significant relationship between the juror and prosecutor he would have struck the juror. Trial counsel also did not recall the petitioner telling him to strike a juror. Had the petitioner made such a request, trial counsel would have complied.

At trial, Investigator Stoney Hughes testified as the State's officer. Based on trial counsel's prior experience with the investigator, he understood Investigator Hughes to have law enforcement expertise concerning methamphetamine. Investigator Hughes testified about handling methamphetamine cases in the past and how methamphetamine paraphernalia looks and operates. He also testified about what is needed to make methamphetamine and how he found the burn piles located on the petitioner's property. Trial counsel vigorously cross-examined Investigator Hughes about his identification of the petitioner's methamphetamine lab and the fact that numerous items necessary for manufacturing methamphetamine were not found on the petitioner's property. Investigator Hughes was never designated as an expert by the trial court, and it was trial counsel's strategy not to qualify Investigator Hughes as an expert because "[trial counsel] didn't want the jury necessarily lending any credence to . . . his testimony."

The petitioner also claimed trial counsel was ineffective for failing to object when the State attempted to impeach the petitioner with his prior theft conviction. Specifically, the petitioner argued trial counsel should have objected when the State asserted the petitioner stole items needed to manufacture methamphetamine. In response, the petitioner attempted to explain the police report stated he stole "consumable goods," like food items, not items needed to manufacture methamphetamine. Trial counsel did not object to the State's use of the petitioner's prior conviction or attempt to show that the State was

mischaracterizing the petitioner's conviction. Trial counsel admitted he should have objected to this line of questioning.

Trial counsel's defense strategy was to show the State's evidence only proved methamphetamine use, not manufacturing of the drug. The petitioner, however, wanted trial counsel to pursue other defense theories. He wanted trial counsel to argue that the evidence of methamphetamine on his property belonged to his neighbor. The petitioner explained to trial counsel the tree line separating his property from his neighbor's was big enough to hide someone doing drugs on his property. Trial counsel presented this defense at trial but given the evidence and the petitioner's fifteen-year history with methamphetamine, trial counsel did not view the theory as a believable defense. The petitioner also told trial counsel about methamphetamine-related crimes occurring near his home and provided trial counsel with a newspaper article reporting the crimes. The methamphetamine-related crimes, however, occurred years before the petitioner's case, and trial counsel believed they were unrelated to the incident on the petitioner's property. Lastly, trial counsel did not present the defense that the methamphetamine-related evidence belonged to Ms. McDonald because he and the petitioner agreed to use her as a witness to show that neither Ms. McDonald nor the petitioner were using methamphetamine at the time of the incident.

The petitioner also testified at the post-conviction hearing. He explained he met with trial counsel four or five times before trial, and during those meetings, the two mainly discussed potential plea deals. The petitioner refused to accept the State's offer because he wanted the charge reduced to a misdemeanor. Yet, he admitted trial counsel informed him that he could not force the State to reduce the charge to that extent. During their meetings, trial counsel and the petitioner also discussed trial strategy and agreed to use Ms. McDonald as a witness. Though the petitioner claimed he asked trial counsel to interview the people who attended the bonfire party, he admitted that he did not do so until the last day of trial and that the timing of his request did not give trial counsel enough time to investigate. The petitioner did, however, ask trial counsel to obtain a defense expert to examine the physical evidence found on his property. Trial counsel explained to him that an expert was unnecessary because the evidence was destroyed due to its hazardous nature.

The petitioner did not recall discussing the search of his property with trial counsel and did not ask trial counsel to file anything regarding the search. The petitioner admitted he agreed to be searched at any time as a condition of his parole. Regarding the photographs taken during the search, the petitioner wanted to know where the photographs were taken because he did not believe the they were taken on his property.

During voir dire, the petitioner heard one of the jurors state they worked out at the same gym as the prosecutor. The petitioner did not make it known to trial counsel that he

wanted the juror struck, and he could not remember the name of the juror. It was not until the petitioner was serving his sentence that he realized the juror should have been struck.

The petitioner felt he was prejudiced by the prosecutor's mischaracterization of his criminal history and that the mischaracterization had an effect on his trial. He explained the line of questioning "paint[ed] him as a meth[amphetamine] cook," and had trial counsel objected, the outcome of the trial would have been different. The petitioner believed trial counsel's case load affected his ability to work on the petitioner's case. He did not feel trial counsel had enough time to prepare, and trial counsel's efforts were not reasonable.

After reviewing the proof, the post-conviction court denied relief. This timely appeal followed.

### *Analysis*

On appeal, the petitioner argues trial counsel was ineffective for numerous reasons. The State contends that trial counsel provided constitutionally effective assistance and that trial counsel's pre-trial and trial conduct was within the realm of prevailing professional norms, reasonable strategic decisions, and was not prejudicial to the defense. Following our review of the record and submissions of the parties, we affirm the judgment of the post-conviction court.

The petitioner bears the burden of proving his post-conviction factual allegations by clear and convincing evidence. Tenn. Code Ann. § 40-30-110(f). The findings of fact established at a post-conviction evidentiary hearing are conclusive on appeal unless the evidence preponderates against them. *Tidwell v. State*, 922 S.W.2d 497, 500 (Tenn. 1996). This Court will not reweigh or reevaluate evidence of purely factual issues. *Henley v. State*, 960 S.W.2d 572, 578 (Tenn. 1997). However, appellate review of a trial court's application of the law to the facts is *de novo*, with no presumption of correctness. *See Ruff v. State*, 978 S.W.2d 95, 96 (Tenn. 1998). The issue of ineffective assistance of counsel presents mixed questions of fact and law. *Fields v. State*, 40 S.W.3d 450, 458 (Tenn. 2001). Thus, this Court reviews the petitioner's post-conviction allegations *de novo*, affording a presumption of correctness only to the post-conviction court's findings of fact. *Id.*; *Burns v. State*, 6 S.W.3d 453, 461 (Tenn. 1999).

To establish a claim of ineffective assistance of counsel, the petitioner must show both that counsel's performance was deficient and that counsel's deficient performance prejudiced the outcome of the proceedings. *Strickland v. Washington*, 466 U.S. 668, 687 (1984); *State v. Taylor*, 968 S.W.2d 900, 905 (Tenn. Crim. App. 1997) (noting the standard for determining ineffective assistance of counsel applied in federal cases is also applied in Tennessee). The *Strickland* standard is a two-prong test:

First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable.

466 U.S. at 687. In order for a post-conviction petitioner to succeed, both prongs of the *Strickland* test must be satisfied. *Id.* Thus, courts are not required to even "address both components of the inquiry if the defendant makes an insufficient showing on one." *Id.*; *see also Goad v. State*, 938 S.W.2d 363, 370 (Tenn. 1996) (stating that "a failure to prove either deficiency or prejudice provides a sufficient basis to deny relief on the ineffective assistance claim").

A petitioner proves a deficiency by showing "counsel's acts or omissions were so serious as to fall below an objective standard of reasonableness under prevailing professional norms." *Goad*, 938 S.W.2d at 369 (citing *Strickland*, 466 U.S. at 688; *Baxter v. Rose*, 523 S.W.2d 930, 936 (Tenn. 1975)). The prejudice prong of the *Strickland* test is satisfied when the petitioner shows there is a reasonable probability, or "a probability sufficient to undermine confidence in the outcome," that "but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694. However, "[b]ecause of the difficulties inherent in making the evaluation, a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.'" *Id.* at 689 (quoting *Michel v. Louisiana*, 350 U.S. 91, 101 (1955)).

A. Failure to Prepare the Petitioner for Trial

The petitioner argues trial counsel was ineffective for failing to adequately meet with him and prepare him to testify at trial. The State contends trial counsel adequately met with the petitioner prior to trial. As to this issue, the post-conviction court made the following findings:

[Trial counsel] talked with [the] petitioner a couple of times. He felt like he discussed the case with him adequately. He went to the property where the search and seizure occurred along with his investigator and the girlfriend of the petitioner. [The p]etitioner was in custody in the Tennessee Department

- 10 -

of Corrections (sic). [Trial counsel] made [the] petitioner aware that they had a four-year offer. He spent time preparing the petitioner to testify.

Based on our review of the record, we agree with the post-conviction court. Trial counsel testified he met with the petitioner multiple times to discuss trial strategy, witness testimony, and plea negotiations. Additionally, trial court went to the crime scene on multiple occasions to develop an understanding of the property and spoke with all the individuals that lived on the property with the petitioner. While trial counsel admitted he spent less time discussing trial preparation with the petitioner than he did plea negotiations and preparing the case for trial, this conduct was tactical given the petitioner's status as a career offender and because the petitioner was incarcerated at the time. The post-conviction court accredited the testimony of trial counsel, and nothing in the record preponderates against the findings of the post-conviction court. *See Tidwell*, 922 S.W.2d at 500. Thus, the petitioner has not shown deficient performance on the part of trial counsel. The petitioner did not put on any proof that there was a reasonable probability that, but for trial counsel's failure to prepare the petitioner for trial, the result would have been different. As a result, the petitioner is also unable to show prejudice, and is not entitled to relief on this issue.

### B. Failure to Negotiate a Favorable Plea Offer

The petitioner argues trial counsel was ineffective because he failed to enter into meaningful plea negotiations. The State contends trial counsel met with prosecutors on several occasions to discuss the case and negotiated the best offer possible. We agree with the State.

To determine whether a petitioner is entitled to relief for ineffective assistance of counsel during plea negotiations, the petitioner has the burden of showing by a reasonable probability that, but for counsel's deficient representation, (1) the petitioner would have accepted the plea, (2) the prosecution would not have withdrawn the offer, and (3) the trial court would have accepted the terms of the offer, such that the penalty under its terms would have been less severe than the penalty actually imposed. *Nesbit v. State*, 452 S.W.3d 779, 800-01 (Tenn. 2014).

Here, the post-conviction court found that the petitioner failed to establish deficient representation and prejudice because trial counsel was able to negotiate a plea deal reducing the petitioner's sentence from eight years to four, and the petitioner voluntarily declined the offer. This conduct is objectively reasonable. While the petitioner claims he would have pled guilty if the State had reduced his charge to a misdemeanor, the petitioner

also admitted trial counsel told him such a result was not likely. Furthermore, the petitioner failed to present any proof establishing the State would have made such an offer. Thus, the petitioner has failed to meet his burden and is not entitled to relief. *Id*.

C. Failure to Investigate and Challenge the Search

The petitioner alleges that trial counsel failed to investigate and challenge the probable cause supporting the search of his property and that the evidence obtained from the search should have been suppressed. The State contends the parole search was lawful, and therefore, there were no grounds for trial counsel to suppress evidence from the search, and we agree.

When trying to prove ineffectiveness in failing to suppress evidence, such as the evidence found during the parole search, the petitioner must demonstrate a reasonable probability that, had the motion been filed, the outcome of the proceeding would have been different. *See Kimmelman v. Morrison*, 477 U.S. 365, 375 (1986). When the accused moves to suppress evidence based on a search, he or she bears the burden of establishing standing to challenge the search, or a reasonable expectation of privacy in the place or thing being searched. *State v. Oody*, 823 S.W.2d 554, 560 (Tenn. Crim. App. 1991). The Tennessee Supreme Court has held that "parolees who are subject to a warrantless search condition may be searched without reasonable or individualized suspicion." *State v. Turner*, 297 S.W.3d 155, 157 (Tenn. 2009).

The record indicates the search of the petitioner's property was legal because he was on parole at the time of the search. Trial counsel testified he did not object to the legality of the search because it was lawful as a condition of the petitioner's parole and an objection was not supported by case law. Additionally, the petitioner testified he did not ask trial counsel to file a motion regarding the search and admitted he consented to searches as a condition of his parole. Because the search was a condition of his parole, the petitioner does not have standing to contest the search. *Oody*, 823 S.W.2d at 560; *Turner*, 297 S.W.3d at 157. Additionally, the petitioner cannot show deficient performance as he failed to present any proof that trial counsel's failure to challenge the search was objectively unreasonable. *Id*. at 688; *Goad*, 938 S.W.2d at 369. The petitioner also failed to prove prejudice because he did not show a reasonable probability that, but for trial counsel's failure to investigate and challenge the search of petitioner's property, the outcome of the trial would have been different. *Strickland*, 466 U.S. at 694. Thus, the petitioner has failed to meet his burden and is not entitled to relief on this issue.

D. Failure to Investigate

- 12 -

The petitioner alleges trial counsel was ineffective for failing to view the crime scene, interview residents of the petitioner's home, and interview witnesses from the bonfire party as to the origin of the alleged methamphetamine lab. The State contends trial counsel adequately investigated the petitioner's case, and we agree.

Trial counsel testified he visited the petitioner's property multiple times with an investigator. He took pictures of the scene and interviewed Ms. McDonald, Ms. Landers, and Mr. Phillips, each of whom were living on the petitioner's property and present during both the bonfire party and the search of the property. According to trial counsel, the petitioner did not ask him to interview anyone who attended the bonfire party, nor did he provide trial counsel with a list of those individuals. The petitioner admitted he did not ask trial counsel to interview the bonfire party attendees until the last day of trial and conceded trial counsel did not have enough time to investigate following the petitioner's request.

When a petitioner contends trial counsel failed to interview witnesses in support of his defense, these witnesses should be presented by the petitioner at the evidentiary hearing. *Black v. State*, 794 S.W.2d 752, 757 (Tenn. Crim. App. 1990). "As a general rule, this is the only way the petitioner can establish that . . . the failure to have a known witness present or call the witness to the stand resulted in the denial of critical evidence which inured to the prejudice of the petitioner." *Id*. The petitioner failed to produce any witnesses at the post-conviction hearing. As a result, the petitioner failed to meet his burden regarding this issue, and he is not entitled to relief.

E. Failure to Retain a Defense Expert

The petitioner alleges trial counsel was ineffective for failing to retain an expert to examine the drug and physical evidence found at the crime scene. The State contends the physical evidence in this case was destroyed because methamphetamine labs are extremely hazardous, and as such, there was no evidence which could safely be taken to a lab for testing or stored for trial, making an expert unnecessary. Upon our review, the record shows the petitioner failed to meet his burden and is not entitled to relief.

Initially, we note, that the petitioner failed to present an expert at the post-conviction hearing. As previously stated, a petitioner who claims ineffective assistance of counsel for failing to call a witness must present the witness during the post-conviction hearing. *Black*, 794 S.W.2d at 757. Because the petitioner failed to call an expert witness at the post-conviction hearing, he cannot meet his burden and is not entitled to relief. *Id*.

Despite the petitioner's failure to call an expert, trial counsel testified he made a strategic and well-informed decision not to call an expert or file a motion regarding the loss

of evidence because the evidence had been lawfully destroyed by law enforcement. Trial counsel testified he had handled several methamphetamine cases and was aware that law enforcement routinely destroyed methamphetamine labs because they are hazardous and extremely dangerous. Thus, trial counsel knew that the filing of such a motion was frivolous. Deference is given to sound tactical decisions made after adequate preparation for the case. *Cooper v. State*, 847 S.W.2d 521, 528 (Tenn. Crim. App. 1992). As a result, the petitioner is not entitled to relief on this issue.

### F. Failure to Strike a Biased Juror

The petitioner argues trial counsel failed to strike a juror that admitted to attending the same gym as the prosecutor. The State contends the prosecutor did not know any of the jurors; therefore, there was no reason for trial counsel to exclude the juror. As to this issue, the post-conviction court found the following:

> There was an issue as to whether or not a juror went to the same gym as the Assistant District Attorney General trying the case. [The petitioner] did not remember the name of the juror. [Trial counsel] was not asked to excuse the juror. [Trial counsel] felt that if there had been any evidence that this juror had a relationship with the Assistant District Attorney, he would have challenged her.

Both the United States and Tennessee Constitutions guarantee a criminal defendant the right to trial by an impartial jury. U.S. Const. amend. VI; Tenn. Const. art. I, § 9. "The ultimate goal of voir dire is to ensure that jurors are competent, unbiased and impartial." *Smith v. State*, 357 S.W.3d 322, 347 (Tenn. 2011) (citing *State v. Hugueley*, 185 S.W.3d 356 (Tenn. 2006). Counsel is granted deference when conducting voir dire. *Miller v. Webb*, 385 F.3d 666, 672 (6th Cir. 2004). "An attorney's actions during voir dire are considered to be matters of trial strategy . . . a strategic decision cannot be the basis for a claim of ineffective assistance unless counsel's decision is shown to be so ill-chosen that it permeates the entire trial with obvious unfairness." *Id.* (quoting *Hughes v. United States*, 258 F.3d 453, 457 (6th Cir. 2001).

For trial counsel's conduct to be ineffective based on the failure to strike a biased juror, the petitioner must show the juror was actually biased against him. *Id.* at 674. "Actual bias is 'bias in fact' -- the existence of a state of mind that leads to an inference that the person will not act with entire impartiality." *Id.* at 673 (quoting *Hughes*, 258 F.3d at 463). "A juror's express doubts to her own impartiality on voir dire does not necessarily entail a finding of actual bias." *Id.* Moreover, the Supreme Court has upheld "the

impaneling of jurors who had doubted, or disclaimed outright, their own impartiality on voir dire." *Id*.; *see Patton v. Yount*, 467 U.S. 1025 (1984).

Here, the petitioner testified he recalled hearing a juror claim they belonged to the same gym as the prosecutor. The petitioner failed to present any proof during the post-conviction hearing as to which juror he was referring or as to how he was prejudiced by the juror. While admitting he would have struck a juror he believed had a significant relationship with the prosecutor, trial counsel did not recall the juror's alleged admission. Based on the record before us, the petitioner has failed to prove his factual allegation that a juror had a relationship, however slight, with the prosecutor and, therefore, is not entitled to relief. Furthermore, even if a juror had made such a disclosure during voir dire, the petitioner has failed to show that trial counsel's decision not to strike the juror permeated the trial with obvious unfairness. *Miller*, 385 F.3d at 672. As a result, the petitioner has failed to show trial counsel was ineffective as it relates to this issue. Accordingly, the petitioner is not entitled to relief.

G. Failure to Challenge Chain of Custody Regarding Physical Evidence

The petitioner also argues trial counsel was ineffective for failing to challenge the origin of the physical evidence allegedly found on the petitioner's property and pictures of the same. The State contends there was no chain of custody issue regarding this evidence because the photographs were properly authenticated before being entered into evidence. The post-conviction court agreed, stating: "[Trial counsel] testified that there was no chain of custody issue. All the photographs had been authenticated." Upon our review, we affirm the finding of the post-conviction court.

The Tennessee Supreme Court has established that before tangible evidence can be introduced at trial, a witness must be able to identify the evidence or establish an unbroken chain of custody. *State v. Cannon*, 254 S.W.3d 287, 296 (Tenn. 2008) (citing *State v. Scott*, 33 S.W.3d 746, 752 (Tenn. 2000)). Each person who has custody or control of the evidence is needed to verify the authenticity of the evidence and to show that it is what it purports to be. *Id*. (citing Neil P. Cohen et al., *Tennessee Law of Evidence* § 9.01[13][c] (5th ed. 2005) (footnotes omitted)). Prior to destroying the methamphetamine lab because it was hazardous, law enforcement officers took photographs of the scene. Trial counsel explained there was not a chain of custody issue because those law enforcement officers authenticated the photographs before they were introduced into evidence. The petitioner, however, claimed the photographs did not accurately depict the location where the evidence was found. The record indicates Investigator Hughes was the only person to have control over the methamphetamine labs on the petitioner's property, and as a result, he was the only witness able to authenticate the evidence. *Id*. At trial, Investigator Hughes

testified that he identified the methamphetamine labs on the petitioner's property and took photographs of the evidence before having Chief Glen Cook, another officer on the scene, video him destroying the same. Investigator Hughes testified the photographs and video recording presented at trial were taken on the petitioner's property the day of the search. This testimony is sufficient to authenticate the photographs presented at trial and establish the photographs depicted the evidence found on the petitioner's property. *Cannon*, 254 S.W.3d at 296. As such, there is not a chain of custody issue regarding the photographs of the petitioner's property, and trial counsel was not ineffective as it relates to this issue. The petitioner is not entitled to relief.

### H. Failure to Object to Investigator Hughes's Testimony

The petitioner alleges trial counsel was ineffective for failing to object to Investigator Hughes's unqualified, expert testimony regarding methamphetamine lab operations. The State contends that Investigator Hughes was not declared an expert because he testified from his training and experience working with methamphetamine labs and that trial counsel vigorously cross-examined him about his identification of the petitioner's methamphetamine lab and the numerous items missing which would be needed to establish the alleged lab. The post-conviction court found the following: "[Trial counsel] stated that [Investigator] Hughes was never called an expert by the [trial court] and that he did not want him to be termed as an expert in front of the jury. This was part of his trial strategy."

Trial counsel testified he did not want the jury to view Investigator Hughes as an expert and strategically chose not to have Investigator Hughes qualified as an expert. This was a tactical decision by trial counsel. The post-conviction court's order denying relief is an accreditation of trial counsel's testimony, and nothing in the record preponderates against the post-conviction court's factual findings. *See Tidwell*, 922 S.W.2d at 500. Deference is given to trial counsel's sound tactical decisions made after adequate preparation for the case. *Cooper*, 847 S.W.2d at 528. Moreover, the petitioner argues Investigator Hughes's testimony was outside the scope of his knowledge because he was not qualified as an expert. Yet, the petitioner did not provide proof at the post-conviction hearing to establish that trial counsel's decision was objectively unreasonable or that he was prejudiced in any way by trial counsel's decision. *Strickland*, 466 U.S. at 687. As a result, the petitioner is not entitled to relief.

### I. Failure to Object to the State's Cross-Examination of the Petitioner

The petitioner argues trial counsel's failure to object to the State's cross-examination about his previous theft conviction was highly prejudicial and suggests the

State mischaracterized the factual basis for the conviction. At the post-conviction hearing, the petitioner produced an incident report for the underlying offense and stated the incident report indicated only food items were stolen. The petitioner contends the State misused the previous offense by asserting the stolen items were items used to manufacture methamphetamine. Trial counsel stated that the State provided him with notice of the State's intent to use the prior theft conviction and admitted he should have objected to the State's questioning regarding the stolen items.

Tennessee Rule of Evidence 609 states felony convictions or other misdemeanor convictions involving dishonesty are admissible impeachment evidence. Theft crimes are viewed as crimes of dishonesty. *See State v. Butler*, 626 S.W.2d 6 (Tenn. 1981). When the witness in a criminal trial is the accused, the prosecution must give pretrial notice to the defendant. *State v. Morgan*, 541 S.W.2d 385 (Tenn. 1976). Here, the petitioner was questioned about a theft conviction and the State gave trial counsel notice, making the State's impeachment evidence admissible.

Under a claim of ineffective assistance of counsel, the petitioner carries the burden of showing the State's use of evidence was prejudicial. *See Strickland*, 466 U.S. at 694. The petitioner argued trial counsel's failure to object allowed the State to mislead the jury as to the petitioner's prior history of methamphetamine use and manufacturing. At the post-conviction hearing the only proof offered by the petitioner was that the State "paint[ed] him as a meth[amphetamine] cook." However, the petitioner failed to produce any evidence showing an objection by trial counsel would have resulted in the exclusion of the impeachment evidence. *See Black*, 794 S.W.2d at 757-58.

The record reflects an abundance of evidence on which a jury could convict the defendant, even with trial counsel's failure to object. According to the proof at trial, methamphetamine labs and proof of manufacturing methamphetamine were found on the petitioner's property; the officer responsible for neutralizing the danger of those methamphetamine labs testified to where he found the labs, how he documented the labs, and how he destroyed the labs; and the petitioner testified he had been a methamphetamine user for fifteen years. When viewed in light of the overwhelming evidence presented at trial, the petitioner has failed to show that the outcome of his case would have been different had trial counsel objected to the State's line of questioning. Thus, the petitioner is unable to prove prejudice and is not entitled to relief on this issue.

J. Failure to Suggest an Alternative Source of Drug-Related Evidence

The petitioner argues trial counsel failed to investigate or develop alternative origins of the alleged methamphetamine lab when other methamphetamine-related crimes had

occurred in the area. The State contends trial counsel investigated and presented other theories of the origin of the methamphetamine lab, but the jury chose not to accept them. As to this issue, the post-conviction court made the following findings:

> [Trial counsel] had [defense] theories regarding the Dr. Pepper bottle that was the subject of the manufacture of the meth[amphetamine] and the bonfire causing the burned evidence. The bonfire had been several weeks earlier. He felt like the tin foil that was found only showed use or possession of the meth[amphetamine] and he covered this theory during trial and in his closing argument. He stated that [the petitioner] never said that his girlfriend, Ms. McDonald, was the responsible party.
> . . .
> [Trial counsel] worked on the theories that [the petitioner] did not have a meth[amphetamine] lab. He went over how he attacked the findings of the officers and presented theories available.
> . . .
> [Trial counsel] had a bad fact situation, and he performed as well as any defense attorney could have performed under the circumstances as they existed. . . . There was little defense to the case other than the petitioner testifying that the information found and seized did not belong to him.

Trial counsel testified he made a strategic decision to argue that the evidence found on the petitioner's property showed use and not "promotion" of methamphetamine. Trial counsel argued the flammables found at the scene were used to start the bonfires at the party and were not methamphetamine-related. He also argued that because the alleged methamphetamine labs were on the property for three weeks, the State could not prove who actually interacted with the labs. Trial counsel also presented the theory that the Dr. Pepper bottle and the tin foil found at the scene only showed methamphetamine use, not manufacturing. As such, trial counsel argued the State's evidence was at most sufficient to show methamphetamine use, and insufficient to show the petitioner was manufacturing methamphetamine. These theories were presented to and weighed by the jury, after which, the jury found the petitioner guilty.

Trial counsel's defense theories were reasonable and are entitled to deference on collateral review. *Strickland*, 466 U.S. at 690-91. The fact that a trial strategy or tactic failed or was detrimental to the defense does not, alone, support a claim for ineffective assistance of counsel. *Cooper*, 847 S.W.2d at 528. Deference is given to sound tactical decisions made after adequate preparation. *Id*. Here, the post-conviction court accredited trial counsel's decisions regarding the appropriate defense for the petitioner's case. *See Tidwell*, 922 S.W.2d at 500. As a result, trial counsel's conduct was not deficient. Additionally, the petitioner did not present any proof at the post-conviction hearing to

support his assertion that there was anyone else to blame for the evidence of methamphetamine manufacturing found on his property. *See Black*, 794 S.W.2d at 757-58. The petitioner is not entitled to relief.

## *Conclusion*

Based upon the foregoing authorities and reasoning, the judgment of the post-conviction court is affirmed.

_____

J. ROSS DYER, JUDGE